James W. Anderson (9829)
Victoria B. Finlinson (15103)
**CLYDE SNOW & SESSIONS**
201 South Main Street, Suite 1300
Salt Lake City, Utah  84111
Email:  jwa@clydesnow.com
          vbf@clydesnow.com
Telephone: (801) 322-2516
Fax No.: (801) 521-6280

*Counsel for the Debtor*

---

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>**CAMPERWORLD, INC.,**<br><br>Debtor. | **Bankruptcy Case No. 17-27764 WTT Chapter 11**<br><br>**Judge William T. Thurman** |

---

### MOTION TO SELL REAL AND PERSONAL PROPERTY

---

Camperworld, Inc., ("**Camperworld**" or "**Debtor**") pursuant to 11 U.S.C. § 363(b), (f) and (m), and Fed. R. Bankr. P. 2002, 6004 and 9014, respectfully submits this Motion to Sell Real and Personal Property (the "**Motion**").  The motion seeks the entry of an Order by the Court authorizing the Debtor to sell all real and personal property owned by the Debtor to Osiris, LLC ("**Buyer**"), pursuant to that certain Agreement for Sale of Land and Assets, a copy of which is attached hereto as Exhibit "A" (the "**Agreement**"), subject to higher and better offers, and free and clear of any and all liens, claims, interests, and encumbrances, with any such liens, claims, interests, and encumbrances to attach to the proceeds of such sale (the "**Sale**").  All capitalized

terms not defined herein have the meanings ascribed in the Agreement. In support of this Motion, the Debtor represents as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2.     On September 9, 2015, the Debtor was formed in the State of Utah to take all assets of the previous debtor, Camperworld Business Trust ("**Camperworld 1**"). The Camperworld 1 bankruptcy case (the "**Camperworld 1 Case**") was also conducted in this Court as case number 15-20383. On or about September 2, 2015, the Court entered in the Camperworld 1 bankruptcy case its *Order Confirming Joint Plan of Reorganization of the Debtor and Committee* [Docket No. 270 in the Camperworld 1 case], which order confirmed the *Joint Plan of Reorganization of the Debtor and Committee dated August 4, 2015* (the "**Plan**") filed by Camperworld 1.

## DESCRIPTION OF BUYER

3.     The Buyer, Osiris, LLC, has the following ownership and management structure, with the identification of the individuals who are the owners or principals of each entity:

| Osiris, LLC Investors/Owners/Members (entity): | Individuals: |
|---|---|
| Munn and Munn Enterprises- | Duane Munn |
| Munn and Munn Enterprises- | Shane Munn |
| Arcadian Properties, LLC- | Tom Souvall |
| LW7 LLC- | Jared Westhoff |
| Alexein LLC- | Alexander Souvall |
| Courtney Richins- | Courtney Richins |
| Travis Sanderson- | Travis Sanderson |

| **Managers:** | **Individuals:** |
|---|---|

Eugene Gordon Inc.-                               Jared Westhoff

Alexein, LLC-                                     Alexander Souvall

4.       The Debtor does not have any direct connections with any of these individuals, other than as part of this Sale. Camperworld 1 had connections with one of these individuals, Tom Souvall. Mr. Souvall was an employee of Camperworld 1, having management oversight over various park managers. He held this position for approximately 2 years, which terminated approximately 5 or 10 years ago. Both prior to this employment and after, Mr. Souvall was an independent contractor of an entity that performed marketing services for Camperworld 1. This relationship ended in December, 2012. Since that time, Mr. Souvall has not had any employment or contractor relationship with Camperworld 1. For information purposes, Alexander Souvall is Tom Souvall's adult son.

## DESCRIPTION OF ASSETS

5.       Pursuant to the Plan, the Debtor received the assets of Camperworld 1 which currently consist primarily of six (6) separate RV Parks (collectively, the "**RV Parks**") operated under the Camperworld business name, and a parcel of undeveloped ground in New Mexico.

6.       The RV Parks are described as follows:

     i.   Echo Island Park (41.80 acres, including an RV park/campground, located at or about 340 S. 500 W., Coalville, Utah) ("**Echo Island Park**");

    ii.   Hot Spring Resort (289.62 acres, including an RV park/campground and golf course, located at or about 5600 W. 19200 N., Garland, Utah) ("**Hot Spring Resort**");

   iii.   Knotty Pine Resort (12.28 acres, including an RV park/campground, located at or about 5175 East State Road (Highway 35), East of

Woodland, Utah) ("**Knotty Pine Resort**");

    iv.  Lakeside Park (8.32 acres, including an RV park/campground, located at or about 8850 S. 26500 W., Duchesne, Utah) ("**Lakeside Park**");

    v.  Pleasant Creek Ranch (22.85 acres, including an RV park/campground, located at or about 2903 S. 1700 E., #69, Mount Pleasant, Utah) ("**Pleasant Creek Ranch**"); and

    vi.  17 individual RV Lots, .05 acres each, at Zions Gate RV Resort (part of a privately owned RV park/campground, located at or about 150 N. 3700 W., Hurricane, Utah) (the "**Zions Gate RV Lots**").

  b.  The undeveloped parcel of ground located in New Mexico (the "New Mexico Property") is located in Luna County, New Mexico, and is also part of the Sale, and is described as:

    i.  Lots Three (3), Four (4), Five (5) and Six (6), Block Thirteen (13), Unit Numbered Seventy-eight (78), Deming Ranchettes, in the County of Luna, New Mexico, as the same is shown and designated on Plat Slide No. 61, thereof filed for record in the Office of the County Clerk of said county on March 01, 1967, Plat Records, Luna County, New Mexico.

7.    Each of the RV Parks, except the Zions Gate RV Lots, are encumbered by liens and security interests held primarily by: (i) ZB, N.A. d/b/a Zions First National Bank ("**Zions Bank**"); and (ii) Actium High Yield Loan Fund II, LLC and its affiliates Actium Loan Management LLC and Actium High Yield Loan Fund LLC (collectively, "**Actium**").

8.      The RV Parks which comprise the collateral of Zions Bank securing its claims against the Debtor are Echo Island Park, Hot Springs Resort, and Knotty Pine Resort (collectively, the "**Zions Bank Collateral**").

9.      The RV Parks which comprise the collateral of Actium securing its claims against the Debtor are Lakeside Park and Pleasant Creek Ranch (collectively, the "**Actium Collateral**").

10.      On September 6, 2017, the Debtor filed a Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code.

11.      Prior to the petition date, the Debtor was actively marketing its assets for sale through Newmark Grubb.  The offers received prior to the Petition Date were insufficient to pay the secured claims on the assets in full and were therefore not accepted by the Debtor.  The current offer for which approval is sought by the Debtor in this Motion represents the best offer received pursuant to the Debtor's marketing efforts.  The back-up offers from Zions Bank and Actium as described below represent the next best offers for the purchase of Debtor's property to date.

12.      In May, 2017, the Debtor engaged in discussions with Souvall Management, Inc. to sell all assets, which resulted in signing the Agreement.  The Buyer received an assignment of all of Souvall Management, Inc.'s rights in and to the Agreement and thereby became the Buyer.

13.      Prior to the petition date, the Debtor lost a significant amount of its members, and the related membership dues.  As a result, the Debtor is not able to continue business operations for any significant amount of time, and has decided that the best way to maximize the value of its assets and pay creditors is to sell all of its assets in an orderly manner as further set forth herein.

## DESCRIPTION OF SALE[1]

14.     The Debtor has agreed to sell, and the Buyer has agreed to purchase, subject to

Court approval, all of the Debtor's assets, including its tangible and intangible assets, for a

purchase price that is comprised partly of cash, and partly of the Buyer's assumption of the

Debtor's debts (the "**Purchase Price**").  Between the cash expected to be paid at the Closing,

and the debts assumed, the Debtor estimates the Purchase Price to be approximately $6,500,000.

After the Closing, all secured claims will be paid in full, and the Buyer will have assumed all

remaining claims against the Debtor and the estate, including all remaining claims under the

Plan, many of which are also expected to be paid by the Buyer at or shortly after the Closing.

Accordingly, the Debtor asserts that, if the sale to Buyer closes as further set forth herein, all

secured and unsecured claims of this estate will be paid in full through the sale process either as

payment in cash at closing or through payment in full and in cash to the secured creditors and the

assumption of unsecured debt by the Buyer.  To the extent the sale to the Buyer does not close

and secured creditors are not paid in full on or before December 27, 2017, this Motion requests

entry of an Order (i) approving a sale by credit bid to Zions Bank of the Zions Bank Collateral

and to Actium of the Actium Collateral, which sale, if approved under this Motion, shall be

deemed automatically to close on December 28, 2017, or (ii) approval of an alternative sale

process to any other potential bidder with a higher and better offer subject to further court

hearing on the condition that any such alternative sale closes prior to December 28, 2017 as set

---

[1] The following represents a summary of the Sale as set forth in the Agreement.  Reference is made to the Agreement for a full description of all terms of the Sale.  To the extent there is any discrepancy between the Agreement and this motion regarding the terms of the Sale, the Agreement controls.

forth immediately below.   The Debtor has sought and obtained the cooperation of Zions Bank and Actium in this sale process.

15.     The Buyer requires a loan in order to complete the Closing, which loan is expected to be guaranteed by the United States Department of Agriculture.  Without this guarantee, the Buyer will not obtain the loan, and will not complete the Closing.

## ALTERNATIVE SALE TO ZIONS BANK

16.     In the event the Buyer does not complete the Closing on or before December 27, 2017, the Debtor has agreed to sell the Zions Bank Collateral to Zions Bank in full satisfaction of any and all claims of Zions Bank against the Debtor and the estate, which sale price shall be deemed paid pursuant to a credit bid by Zions Bank for such Zions Bank Collateral (the "**Zions Bank Sale**") in the amount of Zions Bank's claim against the Debtor.  The additional terms of the Zions Bank Sale include the following:

    a.   In the Sale Order, a specific finding shall be included that Zions Bank is a good faith purchaser for value pursuant to 11 U.S.C. § 363(m);

    b.   The Zions Bank Sale shall constitute a sale of the Zions Bank Collateral to Zions Bank free and clear of any and all interests, liens, claims, and encumbrances to the full extent permissible under 11 U.S.C. § 363(b) and (f) except with respect to any interest, liens, claims, and encumbrances senior to the  Zions Bank liens which shall be assumed by Zions Bank;

    c.   Any stay related to the Zions Bank Sale, including any stay provided for under Bankruptcy Rule 6004, shall be waived and nullified in the Sale Order;

d.  The Debtor shall be authorized and directed to execute and deliver, and empowered to fully perform under, consummate, and implement, the Zions Bank Sale, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the sale, and to take any and all further actions as may be reasonably requested by Zions Bank or any title company in connection with the closing of the Zions Bank Sale;

e.  The Debtor shall have provided notice of the Zions Bank Sale to all entities who may assert any interest in the Zions Bank Collateral including any lienholders, taxing entities, and the like;

f.  Prior to the Zions Bank Sale, the Debtor shall execute special warranty deed and bill of sale conveying the Zions Bank Collateral to Zions Bank, which deed shall be held in escrow by the title company.  In the event the Sale to Buyer has not completed by December 27, 2017, Zions Bank shall be authorized to instruct the escrow agent/ title company to record the special warranty deed in favor of Zions Bank on December 28, 2017, and to release to Zions Bank the bill of sale.  The warranty deed and bill of sale will be issued upon approval of this Motion and held by escrow agent for Zions Bank to be recorded as set forth in this Motion and Order approving the Motion.  To the extent the sale to the Buyer or an alternative buyer as set forth below is approved and closes by December 27, 2017, and Zions Bank is paid in full as set forth herein, Zions Bank shall cause such transfer documents to be returned to the Debtor or destroyed.

g.   Nothing in this Motion modifies Zions Bank's liens and security interests in any of the Zions Bank Collateral, including but not limited to, the priority of such liens and security interests as such liens and security interests existed on the Petition Date; and

h.   On or before December 28, 2017, the Debtor shall deliver to Zions Bank all documents in its possession respecting the Zions Bank Collateral, including but not limited to all appraisals, feasibility studies, financial reports, occupancy reports, and environmental studies if any such documents exist.

**ALTERNATIVE SALE TO ACTIUM**

17.   In the event the Buyer does not complete the Closing on or before December 27, 2017, then the Debtor has agreed to sell the Actium Collateral to Actium in full satisfaction of any and all claims of Actium against the Debtor and the estate, which shall be the sale price and credit bid for such Actium Collateral (the "**Actium Sale**").  The additional terms of the Actium Sale are as follows:

a.   In the Sale Order, a specific finding would be included that Actium is a good faith purchaser for value pursuant to 11 U.S.C. § 363(m);

b.   The Actium Sale is made  free and clear of interests to the full extent permissible under 11 U.S.C. § 363(b) and (f) except with respect to interests senior to the Actium liens which interests shall be assumed by Actium;

c.   Any stay related to the Actium Sale, including any stay provided for under Bankruptcy Rule 6004, shall be waived and nullified in the Sale Order;

d.   The Debtor would be authorized and directed to execute and deliver, and empowered to fully perform under, consummate, and implement, the Actium Sale together with all additional instruments and documents that may be reasonably necessary or desirable to implement the sale, and to take all further actions as may be reasonably requested by Actium or any title company closing the Actium Sale;

e.   The Debtor shall have provided notice of the Actium Sale to all entities who may assert any interest in the Actium Collateral including any lienholders, taxing entities, and the like;

f.   Prior to the Actium Sale, the Debtor shall execute special warranty deed and bill of sale conveying the Actium Collateral to Actium, which deed shall be held in escrow by the title company.  In the event the Sale to Buyer has not completed by December 27, 2017, Actium is authorized to instruct the escrow agent/title company to record the special warranty deed in favor of Actium on December 28, 2017, and release to Actium the bill of sale.  The warranty deed and bill of sale will be issued upon approval of this Motion and held by escrow agent for Actium to be recorded as set forth in this Motion and order approving the Motion.  To the extent the sale to the Buyer or an alternative buyer as set forth below is approved, Actium shall cause such transfer documents to be returned to the Debtor or destroyed.

g.   Nothing in this Motion modifies Actium's security interest in the Actium Collateral, including but not limited to, the priority of such security interest as it existed on the Petition Date; and

h.  On or before December 28, 2017, the Debtor shall deliver to Actium all

documents in its possession respecting the Actium Collateral, including but not

limited to all appraisals, purchase offers, feasibility studies, financial reports,

occupancy reports and environmental studies if any such documents exist.

### LIST OF SECURED CLAIMS

18.    The following financial liens exists against the real property, and are listed in

order of priority as to each property[2]:

a.  **Echo Island Park.**

i.  Property Taxes.  Property taxes were not paid for 2016.  As a result,

Summit County is owed $9,715.55 in general property taxes, $231.46 in

special assessment taxes, and $25.00 for 2015 personal property taxes,

plus applicable penalties and interest on all of the foregoing amounts.

ii.  Zions Bank recorded a Deed of Trust on May 28, 2013, in the amount of

$4,100,000.00, plus interest, as Entry No. 971162, in book 2188, page

793.

iii.  Weber Basin Water Conservancy District recorded a Notice of Lien in the

amount of $21,483.53, plus penalties, fees and interest, on April 28, 2016,

as Entry No. 1043887, in book 2349, page 356.

---

[2] On September 12, 2017, the original buyer, Souvall Management, Inc., recorded a notice of interest against some of the Debtor's property, with the intent of conveying to creditors a true desire to purchase.  This notice of interest was recently brought to the Debtor's attention, and the Debtor explained to Souvall Management, Inc. that this violated the Bankruptcy Code.  Souvall Management, Inc. forthwith recorded a release of the notice of interest.

iv.  Notice of Interest wherein Coalville City claims and intends to hold and claim a lien and or interest estate upon the subject property, recorded May 23, 2017, Entry No. 1070147, in book 2411, at page 406.

b.  **Hot Springs Resort.**

i.  Property taxes for 2016 were not paid, and as a result Box Elder County is owed $7,789.78, plus penalties and interest.

ii.  Zions Bank recorded a Deed of Trust on May 28, 2013, in the amount of $4,100,000.00, plus interest, as Entry No. 325971, in book 1208, page 742.

c.  **Knotty Pine Resort.**

i.  Property taxes for 2016 and some for 2015 were not paid, and as a result Summit County is owed $3,943.62 for general property taxes, $125.46 for special assessment taxes, and $25.00 for 2015 personal property taxes, plus penalties and interest accruing on all of the foregoing.

ii.  Zions Bank recorded a Deed of Trust on May 28, 2013, in the amount of $4,100,000.00, plus interest, as Entry No. 1001725, in book 2254, page 1410.

d.  **Lakeside Park.**

i.  2016 property taxes were not paid, and as a result Duchesne County is owed $2,731.79, plus penalties and interest.

ii.  Actium recorded a Deed of Trust on June 25, 2015, in the amount of $500,000, plus interest, as Entry No. 485728.

      iii.  Actium recorded an Amended Deed of Trust on May 24, 2016, as Entry No. 494431 increasing the amount loaned as set forth under the amended promissory note.

**e. Pleasant Creek Ranch.**

      i.  Property taxes for 2016 were not paid, and as a result Sanpete County is owed $4,148.91, plus penalties and interest.

      ii.  Actium recorded a Deed of Trust on June 25, 2015, in the amount of $500,000, plus interest, as Entry No. 206637, in book 681, at page 1346.

      iii.  Actium recorded an Amended Deed of Trust on May 23, 2016, as Entry No. 212807, in book 695, at page 115 increasing the amount loaned as set forth under the amended promissory note.

**f. Zions Gate RV Lots.**

      i.  Property taxes for 2015 and 2016 were not paid, and as a result Washington County is owed $4,517.27, plus penalties and interest.

**g. New Mexico Property.**

      i.  None.

## TREATMENT AND PAYMENT OF SECURED CLAIMS; ALTERNATIVE SALE AND BIDDING

19.    As part of the Sale to the Buyer, the Debtor proposes to pay all of the foregoing liens in full from the proceeds of the Sale, at the Closing.  To the extent 2017 property taxes are not paid prior to the Closing, the same will also be paid from the proceeds of the Sale at the Closing.

20.     To the extent the Zions Bank Collateral is sold to Zions Bank as part of the Zions

Bank Sale, the Debtor proposes that Zions Bank shall be responsible to pay all liens with a

higher priority than its Deed of Trust, if any, and that all liens with a lower priority than Zions

Bank's Deed of Trust shall attach to any proceeds of sale as set forth under Section 363 and will,

as a result, be eliminated as if Zions Bank had executed its credit bid rights under 11 U.S.C. §

363(k) as part of the Zions Bank Sale.  If the Buyer does not close the Sale to the Buyer as

contemplated hereunder, and to the extent any holder of a lien junior to the Zions Bank Deed of

Trust, if any, desires to make a bid on the Zions Bank Collateral, such entity shall make an offer

sufficient to pay Zions Bank in full on or before December 28, 2017, with any excess proceeds

held by the estate for further distribution in accordance with Court order.   To the extent that the

Zions Bank Collateral may be sold to an alternative buyer, as set forth above, the Debtor shall

schedule an additional hearing before the Court seeking approval of a sale to such buyer prior to

December 27, 2017,such that the alternative sale, if approved, may close prior to December 28,

2017, after which the sale of the Zions Bank Collateral to Zions Bank pursuant to credit bid as

set forth above shall be deemed to have closed to Zions Bank pursuant to the recording of the

warranty deeds and release of bills of sale.

21.     To the extent the Actium Collateral is sold as part of the Actium Sale, then the

Debtor proposes that Actium shall be responsible to pay all liens with a higher priority than its

Deed of Trust, and all liens with a lower priority than its Deed of Trust shall attach to any

proceeds of sale as set forth under Section 363 and will, essentially, be eliminated as if Actium

had executed its credit bid rights under 11 U.S.C. § 363(k) as part of the Actium Sale.  The

Debtor has no knowledge of any junior liens in the Actium Collateral and no such interest is

identified in the title reports obtained by Actium and/or the Buyer.  If the Buyer does not close

the sale contemplated hereunder and to the extent any other entity, including the holder of a lien

junior to the Actium Deed of Trust if any, desires to make a bid on the Actium Collateral, such

entity shall make an offer sufficient to pay Actium in full on or before December 28, 2017 with

any excess proceeds held by the estate for further distribution in accordance with Court order.

To the extent the Actium Collateral may be sold to an alternative buyer, as set forth above, the

Debtor shall schedule an additional hearing before this court seeking approval of the sale to such

buyer before December 27, 2017 such that the alternative sale may close prior to December 28,

2017 when the Actium Collateral sale to Actium pursuant to credit bid as set forth above shall

close pursuant to the recording of deeds and release of bills of sale.

## TREATMENT AND PAYMENT OF ALL OTHER CLAIMS

22.    With respect to any and all other claims against the Debtor and the estate, to the

extent the Sale occurs with the Buyer, the Agreement obligates the Buyer to assume and pay any

and all such claims, and therefore the Debtor proposes that such claims shall be eliminated from

the Debtor and the estate.  The one exception is administrative claims in this bankruptcy case.

For those claims, the Buyer shall place a sufficient amount in escrow with the Debtor to pay the

estimated amount of such claims, taking into consideration any retainer already held by such

professionals.  To the extent the Zions Bank Sale and the Actium Sale or any alternative sale

occur as set forth above, then all such claims shall remain obligations of the Debtor and the

estate as they were on the petition date, and shall be administered pursuant to further proceedings

in this bankruptcy case.

23.     While the Debtor is not in control of the Buyer, the Debtor understands that the Buyer intends to pay all allowed administrative claims under the Plan in full at the Closing. However, in the event there are not sufficient funds to do so based on the Buyer's cash needs for business operations, the Buyer shall place a lien against the Zions Gate RV Lots in favor of such administrative claim holders, and shall pay them in full on or before six (6) months after the Closing.  If such claims are not paid in full at such time, the holders of such claims shall be entitled to foreclose such lien to collect the amount owed.

24.     Section 363(b)(1) authorizes the Debtors to sell, other than in the ordinary course of business, property of the estate with Court approval.  The Debtors assert that the sale or property of the estate as set forth above may be approved under that authority and the factual circumstances of this case.

### APPLICABLE AUTHORITY

25.     A debtor in possession may sell property of the estate outside the ordinary course of business.  11 U.S.C. §§ 363(b)(1) and 1107(a).  A Chapter 11 debtor may sell all or substantially all of its assets outside of a plan of reorganization.  *See, In re General Motors Corp.,* 407 B.R. 463 (Bankr. S.D.N.Y. 2009).  In order to approve a sale of a debtor's assets outside the ordinary course of business, there must exist: (1) a sound business reason for the sale; (2) adequate and reasonable notice to interested parties, including the sale terms and the Debtor's relationship with the buyer; (3) a fair and reasonable sale price; and (4) good faith on the part of the buyer.  *See In re Medical Software Solutions*, 286 B.R. 431, 439-40 (Bankr. D. Utah 2002). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an

informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." *In re Johns-Manville Corp.,* 60 B.R. 612, 615-616 (Bankr. S.D.N.Y.) ("a presumption of reasonableness attaches to a Debtor's management decisions"). The court, however, is not to substitute its business judgment for that of the debtor. *See, e.g., In re Ionosphere Clubs, Inc.,* 100 B.R. 670, 676 (Bankr. S.D.N.Y. 1989).

26. A sound business reason exists for the proposed sale. The Debtor, due to lack of operational funds, is unable to sustain operations. The sale to the Buyer provides a method to satisfy creditors and to pay the claims against the estate much more quickly than through operations of the RV Parks or any other method of disposition of estate assets. The Debtor does not make sufficient money from operations to pay its debts or fund a chapter 11 case for an extended period of time. Accordingly, it is imperative to close the sale of Debtor's assets quickly. In addition, the sale provides for the payment of all Camperworld 1 claims that were assigned to the Debtor under the Plan. The alternative bidding and sale procedures are also reasonable in that it allows the Debtor to consider any other potential sale or, finally, a credit bid sale to lienholders if no other sale is possible, within a reasonable period of time described in this Motion.

27. Similarly, payment of the liens at the Closing is the product of the Debtors' good business judgment. The Debtor does not dispute the validity of these claims, nor their priority as secured creditors. There is no reason to continue to accrue interest, penalties and/or fees on these obligations while the bankruptcy case is administered. These obligations should be simply paid at the closing and free the estate of the monthly interest carrying costs.

28.     The Agreement is the product of good faith.  The Debtor has spent several months marketing the real property and has received other offers, none of which have been sufficient to pay the secured claims.  The Debtor believes the Buyer is not related to the Debtor, its owners or creditors.  The Agreement is the result of several months of arms-length negotiations.  There is no collusion or attempt to take advantage of others.  *See, e.g., In re Ewell,* 958 F. 2d 276 (9th Cir. 1992).  In addition, there is no special treatment to insiders, but the estate benefits as a whole.

29.     It has long been recognized that bankruptcy courts have the power to authorize the sale of property free of liens with the liens attaching to the proceeds, with or without the consent of the lienholder.  As set forth in §363(f), a debtor may sell estate property free and clear of any liens, claims and encumbrances if:

> (1)     applicable non-bankruptcy law permits the sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

30.     The import of section 363(f) is that liens and interests in property to be sold should be adequately protected.  *In re Johns-Manville Corp.,* 837 F.2d at 94.  In sales, the most common form of adequate protection is by attaching the liens to the proceeds of the sale.  *In re WPRV-TV, Inc.,* 143 B.R. 315 (D.P.R. 1991).

31.     In this case, the Debtor does not dispute any of the liens, and Buyer is willing to simply pay them in full at the Closing.  There is no need to burden the estate by continuing to incur interest on the associated claims.  Therefore, the Court should approve the Agreement free and clear of all liens because the liens are either paid at closing, or, in the event of a Zions Bank Sale and Actium Sale, any such liens are junior to the liens of Zions Bank and Actium, respectively, and will be eliminated under applicable Utah foreclosure law as a result of Zions Bank and Actium asserting their credit bid rights through their respective sales.  Except as set forth above, the Debtor is unaware of any junior interests.  To the extent any junior interests are identified pursuant to any recent lien filings, such liens would be subject to a bona fide dispute under Section 363(f)(4) of the Bankruptcy Code as filings either violative of the automatic stay or filed during the 90 day period prior to the case filing subjecting such lien to avoidance as a preferential transfer.

32.     Finally, the Debtor requests that the Order approving the Sale be effective immediately to accommodate the Buyer's schedule and desire to take over operations as soon as possible.  Therefore, the Debtor respectfully requests that the Court use its authority under Rule 6004(h) to make the Sale Order effective upon entry.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court approve the Agreement and enter an order, effective immediately upon entry pursuant to Rule 6004(h), authorizing the Debtor to complete any and all tasks necessary to effectuate and close the Sale, pursuant to the Agreement, or if necessary, complete any and all tasks necessary to effectuate and close the: (1)

Zions Bank Sale and Actium Sale; or (2) the alternative sale to a higher bidder as set forth

herein.

DATED this 27th day of October 2017.

Clyde Snow & Sessions

/s/ *James W. Anderson*
James W. Anderson

**EXHIBIT "A"**

## AGREEMENT FOR SALE OF LAND AND ASSETS

This AGREEMENT FOR SALE OF LAND AND ASSETS (the "Agreement" or the "Contract") is made and entered into as of the _23_ day of May, 2017, by and between CAMPERWORLD, INC., a Utah non-profit corporation d/b/a Retrallia RV Resorts, successor-in-interest to Camperworld Business Trust, a Utah business trust, and Camperworld Utah, Inc., a Utah corporation acting, as seller ("SELLER" or the "Reorganized Debtor"), and SOUVALL MANAGEMENT, INC., a Utah corporation, or its permitted assign(s) ("BUYER"). All of the foregoing sometimes may be referred to collectively as the "Parties" or individually as a "Party".

### RECITALS

A.     On or about January 20, 2015, Camperworld Business Trust, a Utah business Trust ("Camperworld BT"), filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Court"), thereby initiating Case No. 15-20383 (the "Bankruptcy Case").

B.     On or about September 2, 2015, the Bankruptcy Court entered in the Bankruptcy Case its *Order Confirming Joint Plan of Reorganization of the Debtor and Committee* [Docket No. 270] (the "Confirmation Order"), which order confirmed the *Joint Plan of Reorganization of the Debtor and Committee dated August 4, 2015* (as attached to and confirmed by the Confirmation Order, the "Confirmed Plan").

C.     Pursuant to section 5.1 of the Confirmed Plan, SELLER was "vested with all of the assets of the [Chapter 11 Bankruptcy] Estate, including all of the rights and assets of both Camperworld Business Trust, a Utah business trust, and Camperworld Utah, Inc., a Utah nonprofit corporation. All such assets [were] transferred to the Reorganized Debtor free and clear of any and all claims and interests pursuant to authority of 11 U.S.C. §§ 363(f) and 1123(a)(5)(D), but subject to any and all Allowed Secured Claims" as provided under the Confirmed Plan.

D.     SELLER owns and manages for its private members seven private RV Resorts/campgrounds located throughout the State of Utah, including (as listed on Exhibit A) (collectively, the "RV Resorts", the "Land" or the "Real Property"):

    i.      Echo Island Park (approximately 41.80 acres), including an RV park/campground, located at or about 340 S. 500 W., Coalville, Utah) ("Echo Island Park");

    ii.     Hot Spring Resort (approximately 289.62 acres), including an RV park/campground and golf course, located at or about 5600 W. 19200 N., Garland, Utah) ("Hot Spring Resort");[1]

---

[1]     The Hot Springs Resort is (or may be) subject to a pre-existing purchase contract(s) in favor of person(s) other than BUYER. SELLER shall have the right to complete the sale of the Hot Springs Resort to such person(s) according to the terms of such existing contract(s). SELLER'S obligation to sell and convey the Hot Springs Resort is contingent upon the non-performance of the buyer(s) under such pre-existing contract(s). If such a sale occurs, the Hot Springs Resort shall be treated as an Excluded Asset under this Agreement.

{00328363.DOC /}

iii.    Knotty Pine Resort (approximately 12.28 acres), including an RV park/campground, located at or about 5175 East State Road (Highway 35), East of Woodland, Utah) ("Knotty Pine Resort");

iv.    Lakeside Park (approximately 8.32 acres), including an RV park/campground, located at or about 8850 S. 26500 W., Duchesne, Utah) ("Lakeside Park");

v.    Pleasant Creek Ranch (approximately 22.85 acres), including an RV park/campground, located at or about 2903 S. 1700 E., #69, Mount Pleasant, Utah) ("Pleasant Creek Ranch");

vi.    17 individual RV Lots (approximately .05 acres each), located at Zions Gate RV Resort (part of a privately-owned RV park/campground, located at or about 150 N. 3700 W., Hurricane, Utah) (the "Zions Gate RV Lots");

vii.    4 lots (approximately .5 acres) consisting of unimproved land sometimes referred to as the "Demming Ranchettes" located in Luna (and/or Demming), New Mexico;

viii.    timeshare interests, if any, owned by SELLER including (potentially, if it has not been terminated or cancelled for non-payment of dues and assessments) (a) a timeshare at the Lift Lodge in Park City, Utah, and (b) a timeshare with the Club Park Avenue Condominiums in Park, City Utah;

ix.    Any water rights, buildings, improvements, easement rights, rights of way or other real property rights or interests relating to or appurtenant to any of the foregoing.

E.    SELLER also owns personal property assets located at the RV Resorts, at SELLER'S corporate office and at other miscellaneous locations, including (i) certain trucks, trailers and tractors, (ii) mowers, (iii) equipment, (iii) tools, (iv) office furniture, (v) office equipment, (vi) contracts, books, files and lists, (vii) accounts receivable, (viii) contract and contract rights, (ix) other tangible personal property, (x) water stock and/or water shares, and (xi) intangible property, including trade names and internet domain names (collectively, the "Personal Property").

F.    The Land is subject to liens, and the Personal Property (at least equipment and property located upon or otherwise appurtenant to the RV Resorts) may be subject to liens.

i.    Lakeside Park and Pleasant Creek Ranch (and, potentially, some or all of the Personal Property) are subject to liens in favor of Actium High Yield Loan Fund II, LLC and its affiliates Actium Loan Management LLC and Actium High Yield Loan Fund LLC (collectively, "Actium").

ii.    Echo Island Park, Hot Springs Resort and Knotty Pine Resort (and, potentially, some or all of the Personal Property) are subject to liens in

favor of ZB National Association f/k/a Zions First National Bank
("Zions").[2]

    iii.    The Land is, or may be, subject to liens for unpaid real property taxes.

    iv.    The Land is, or may be, subject to liens in favor of special service districts.

    G.    The Land and Personal Property also are subject to the rights of creditors pursuant to the Confirmation Order and the Confirmed Plan. In short, SELLER has the right to sell the Land and the Personal Property, but must ensure that all of its creditors are paid in full from the cash proceeds of the sale.

    H.    SELLER is a nonprofit corporation owned and controlled by its private members (the "Members").

    I.    SELLER desires to sell and transfer to BUYER, and BUYER desires to purchase and acquire from SELLER, the Land and the Personal Property.

A G R E E M E N T

NOW, THEREFORE, for good and valuable consideration and in consideration of the covenants, agreements, terms and provisions contained herein, the parties agree as follows:

## ARTICLE I:  SALE OF ASSETS

    A.    *Acquired Assets.*  SELLER hereby sells and conveys, and BUYER hereby purchases and acquires as Closing (as defined in Article X, below) all of the following assets, property, and items (the "Assets" or the "Property" or the "Acquired Assets"):

    1.    the Land (unless an individual parcel of Land becomes, an Excluded Asset);[3]

    2.    the Personal Property (unless it is identified as, or becomes, an Excluded Asset);[3] and

    3.    All of the other assets of SELLER, Camperworld BT and/or Camperworld Utah, Inc. ("Camperworld UI") (except only those items identified as Excluded Assets).

---

[2]    Zions has initiated non-judicial foreclosure proceedings against all of the Land and Personal Property that is subject to its liens (including certain water stock relating to the Hot Spring Resort). To the extent Zions completes foreclosure upon any Real Property or Personal Property, such property shall be treated as an Excluded Asset under this Agreement.

[3]    As described in footnotes 1 and 2, above, certain parcels of Land may be sold to third parties and/or may be foreclosed by Zions. If such a sale or foreclosure occurs, the individual parcels of Land (and related Personal Property) that is sold or foreclosed shall be treated as an Excluded Asset.

B.    *AS-IS Sale.*  BUYER is purchasing the Assets (including the Land and Personal Property) in an "AS IS," "WHERE IS," "IF IS" CONDITION, SUBJECT TO "ALL FAULTS," INCLUDING BUT NOT LIMITED TO BOTH LATENT AND PATENT DEFECTS.  BUYER HEREBY WAIVES ALL WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE CONDITION AND USE OF THE ASSETS, INCLUDING, BUT NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  *BUYER accepts the Assets in "AS IS" condition as of the Closing, including any hidden defects, known or unknown.  SELLER shall not be responsible for the repair, replacement or modification of any deficiencies, malfunctions or mechanical defects in the material, workmanship and mechanical components of the appurtenant structures and improvements upon the Land prior or subsequent to Closing.  BUYER agrees that SELLER shall have no liability for any claim or losses BUYER or BUYER'S invitees may incur as a result of any condition or other defect which may now or hereafter exist with respect to the Land or any Personal Property.*  The terms and conditions described in this paragraph shall survive Closing.

C.    *No Representations or Warranties by Seller.*  Except as provided in section VIII of this Agreement, BUYER hereby affirms that SELLER, SELLER'S agents and/or attorneys have not made, nor has BUYER relied upon, any representation, warranty, or promise with respect to the Assets (including the Land and Personal Property), any improvements, fixtures or personal property located upon the Land, or any other subject matter of this Agreement, including, without limitation, any warranties or representations, expressed or implied, as to (a) the general plan designation, zoning, value, use, tax status or physical condition of the Land, or any part thereof, (b) the existence or non-existence of hazardous materials on or under the Land, (c) the accuracy of any survey, soils report or other plan or report with respect to Land, and (d) the condition of personal property, title to personal property or whether any personal property is encumbered by liens.  The terms and conditions described in this paragraph shall survive Closing.

## ARTICLE II:  ASSETS TO BE RETAINED BY SELLER

*Excluded Assets.*  SELLER shall retain all right, title, and interest in and to the following items as of the Date of Possession (collectively, the "Excluded Assets"):

a.    all cash on hand or on deposit;

b.    all tax rebates and insurance claims;

c.    personal property located at the RV Resorts that is owned by the camp manager(s) personally;

d.    all property and assets which are not designated as Acquired Assets; and

e.    Any items identified as Excluded Assets by Buyer prior to Closing.

## ARTICLE III:  EARNEST MONEY DEPOSIT; PURCHASE PRICE

A.    *Earnest Money.*  No later than two (2) business days following execution of this Agreement by BUYER, BUYER shall deposit with the Escrow Agent the sum of Thirty Thousand Dollars ($30,000) in the form of a certified check or wire transfer (the "Earnest Money Deposit"), to be deposited in escrow in accordance with state law, and the Escrow Agent shall

execute an earnest money receipt, and shall cause the original receipt to be delivered to SELLER with a copy to BUYER. The $30,000 Earnest Money Deposit shall be refunded to BUYER if a 3rd party investor replaces it in kind and the BUYER requests the refund. The Earnest Money Deposit shall be held by the Escrow Agent pending (a) the issuance of a Commitment for Title Insurance certifying that title to the Property is free and clear of all liens, encumbrances, and defects, other than the lien for accruing general property taxes for the year 2017, and (b) the Closing, at which time the Earnest Money Deposit will be applied in partial payment of the Purchase Price, or until this Agreement is cancelled by either party in accordance with the terms of this Agreement. The Earnest Money Deposit shall become non-refundable if BUYER does not cancel this Agreement prior to expiration of the Title Deadline or the Due Diligence Deadline, as applicable. Once the Earnest Money Deposit becomes non-refundable, it shall be forfeited to SELLER as liquidated damages in the event BUYER fails to timely deliver the entire Purchase Price and make all of its other Closing deliveries on or before the Settlement Deadline.

B.    *Purchase Price.* BUYER agrees to pay SELLER or its assigns as part of the purchase price of all the assets to be sold as set forth in Article I above (along with the additional consideration described in section III.D, below, and elsewhere in this Agreement), the total purchase price of: cash in the amount of FIVE MILLION SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($5,750,000.00) (the "Purchase Price").

C.    The cash portion of the Purchase Price shall be paid and delivered as follows:

1.    Cash in the amount of the entire Purchase Price (the "Cash Proceeds") shall be delivered to the Escrow Agent (as defined below) at or prior to the time of Closing (as defined below).

2.    At the time of Closing, the Escrow Agent shall pay from the Cash Proceeds in full the payoff amounts due to the following:

i.    Actium;

ii.    Zions;

iii.    Weber Basin Water Conservancy;

iv.    Duchesne County;

v.    Box Elder County;

vi.    each of the counties in which the Land or Personal Property sit, any and all past due real property taxes and/or personal property taxes;

vii.    the Utah State Tax Commission;

viii.    the law firm Cohne Kinghorn, P.C.;

ix.    the law firm Berry & Tripp, P.C.;

x.    the accounting firm Stayner Bates & Jensen PC;

xi.    the accounting firm WSRP, LLC;

xii.   all utility fees or charges payable by SELLER; and

xiii.   Other liabilities of SELLER as identified by SELLER to be paid at the time of closing from the Cash Proceeds.

3.   At the time of Closing, the Escrow Agent shall transfer Cash Proceed in the amount determined and designated by SELLER to a special, segregated account of SELLER, for the purpose of paying in full all "Allowed Claims" payable under the Confirmed Plan.  Without limitation, the amount of Cash Proceeds shall be sufficient:  (i) to pay in full all unpaid Administrative Expenses (as defined in the Confirmed Plan); (ii) to pay in full all Tax Claims (as defined in the Confirmed Plan); (iii) to pay in full all Allowed Class 1 Claims (as defined in the Confirmed Plan); (iv) to pay in full all amounts payable under sections 5.5.1 through 5.5.11 of the Confirmed Plan; and (v) to pay in full the "Class 2 Cash Distribution Amount" (as defined in section 4.2.4 of the Confirmed Plan) due to each holder of an Allowed Class 2 Claims that is entitled to such cash distribution.

4.   All fees, insurance premiums or other amounts due to the Escrow Agent for closing or escrow services shall be paid from the Cash Proceeds at Closing.

5.   The insurance premiums due and payable to the Escrow Agent or other title insurer necessary to obtain an Extended Coverage ALTA Title Policy for each of (unless such Land is or becomes and Excluded Asset) Echo Island Park, Hot Spring Resort, Knotty Pine Resort, Lakeside Park, Pleasant Creek Ranch, and the Zion's Gate RV Lots shall be paid from the Cash Proceeds at Closing.  The Cash Proceeds shall not be used, and SELLER shall not be obligated, to purchase or pay for title insurance with respect to the land located in Luna (and/or Demming), New Mexico, or the timeshare interests.

6.   Any commissions or finder's fees payable by SELLER to real estate brokers or agents shall be paid from the Cash Proceeds at Closing.

7.   The Cash Proceeds shall be used to pay all other debts, liabilities and obligations of SELLER as identified by SELLER, including obligations known or anticipated as of Closing, as well as obligations that are presented or become known only after Closing.

8.   Once all of the amounts specified in sections C.2 through C.7 of this this Article have been paid in full, after SELLER has determined (in its sole and absolute direction) and certified that all of its obligations under the Confirmed Plan have been paid and satisfied in full, after SELLER has determined (in its sole and absolute direction) and certified that all other liabilities of SELLER (including obligations of Camperworld BT and Camperworld UI) arising on or after January 20, 2015 have been paid in full, and after SELLER has reserved an amount sufficient (in its sole and absolute discretion) to pay unknown expenses, debts and obligations that

may be presented to or demanded of it after Closing (the "Reserve"), the remaining unused Cash Proceeds (the "Remaining Funds") shall be contributed to the New Membership Company (as defined below), which funds shall be earmarked for use by the New Membership Company solely to (a) make repairs or capital improvements to the RV Resorts, (b) to pay operating expenses relating to opening and/or operating the RV Resorts, or (c) reserved for paying future expenses for repairs, capital improvements or operations. Any portion of the Reserve that remains unused as of one year after Closing, and which has not been earmarked to pay then known expenses, debts and obligations, similarly shall be contributed to the New Membership Company.

D.     As additional consideration given in exchange for the Acquired Assets, title to the Acquired Assets shall be vested in a new entity to be formed by BUYER (the "New Membership Company").

1.     New Membership Company shall own, operate and manage the RV Campgrounds and other Acquired Assets hereunder.

2.     BUYER represents, warrants and covenants that the New Membership Company will be sufficiently capitalized, even after paying the Purchase Price (and satisfying all of SELLER'S debts and obligations) to meet and pay the operating expenses for the RV Resorts to open them for the 2017 season.

3.     New Membership Company shall offer "Founding Memberships" to all of SELLER'S members in good standing, which shall not be subject to any payments or financial commitments except payment of a one-time processing fee in the amount of $99.00, and (b) the obligation to pay dues in future years.

4.     Terms and conditions applicable to "Founding Members" shall be more specifically described on Schedule III.D hereto, and the form of contract that will be applicable to Founding Members is attached hereto as Exhibit B.

5.     BUYER and New Membership Company shall be jointly responsible for property improvement/repairs required to open parks.

6.     BUYER and New Membership Company shall honor all outstanding guest passes.

7.     BUYER and New Membership Company shall honor all current reservations made.

8.     BUYER and New Membership Company shall honor and satisfy the RV Show contest winner's prizes.

## ARTICLE IV:  NO ASSUMED LIABILITIES

BUYER is not assuming any obligation of SELLER to any persons, including any obligations secured by the Land and Personal Property.  To the extent the Assets are subject to any duly perfected liens as of Closing, BUYER does not intend, and shall not be deemed to have undertaken any duty, to assume or pay such obligations.  Rather, it is anticipated that all liens attached to or relating to the Assets will be paid from the Cash Proceeds at or after Closing.  To the extent any liens or interest in the Assets are not paid and satisfied at closing (by reason of mistake, inadvertence, and agreement of the Parties or for any other reason), such liens or interests may be paid and satisfied from the Remaining Funds.

## ARTICLE V:  CONTINGENCIES TO SELLER'S OBLIGATIONS

SELLER'S obligations under this Agreement as subject to satisfaction of each of the following conditions:

A.     *Agreement Contingent upon Member Approval.*  Per SELLER'S articles and bylaws (and the terms of the Confirmation Order and Confirmed Plan), SELLER may not sell any of the Land or other material Assets without first obtaining approval of its "Members" as specified in the articles and bylaws.  Without limitation, a special meeting of Members must be properly noticed and held, and membership approval must be obtained, before Closing.

B.     *Contingency upon Payoff of Secured Lenders.*  SELLER may not sell or transfer title of any of the Land or Personal Property that is subject to existing liens (including the liens of Zion's and Actium) without paying and satisfying in full the obligations secured by such liens.

C.     *Agreement Contingent upon Seller's Ability to Satisfy All Debts and Obligations.*  SELLER may not sell or divest itself of material assets without paying and satisfying its obligations due to taxing authorities, professionals (including attorneys, accountants and tax preparer), other holders of Administrative Expense Claims, all Allowed Claims payable in cash pursuant to the terms of the Confirmation Order and the Confirmed Plan, and all post-bankruptcy debts and obligations of SELLER (i.e., all debts and obligations of SELLER, Camperworld BT and/or Camperworld UI incurred on or after January 20, 2015).  SELLER may not close or convey the Assets to BUYER unless all such obligations are paid at Closing, or an amount sufficient to pay them is reserved at the time of Closing.

## ARTICLE VI:  DUE DILIGENCE BY BUYER

A.     *Purpose of Due Diligence and Contingencies.*  BUYER acknowledges that Seller has advised and urged BUYER to make all necessary inspections at BUYER'S expense.  The purpose of inspection and due diligence is to inform BUYER in a written report specifically prepared for BUYER whether the Land and other Assets are in a condition materially different than BUYER expected when making the offer to purchase the Assets by executing this Agreement.  BUYER acknowledges that it is BUYER'S sole responsibility to obtain reports by qualified professionals, and that it would not be reasonable for BUYER to rely upon any information, reports or other documentation received from SELLER.  In this regard, BUYER acknowledges and agrees that is has not, and will not, rely upon any reports, documents, information or due diligence materials provided by or received from SELLER.  Rather, BUYER

shall, and will, conduct its own independent due diligence and verification of all information relating to the Assets.

B.    *Seller Disclosures.*  SELLER already has provided, or shall make its best efforts to provide within ten calendar days after execution of this Agreement by BUYER:  (a) a property condition disclosure for the Land, signed by a representative of SELLER (which is made and given for informational purposes, and without representation or warranty of any kind); (b) the Title Commitments (as defined below) for the Land (excluding the New Mexico property and the timeshares); (c) a copy of all leases and rental agreements now in effect with regard to the Land together with a current rent roll; and (d) operating statements relating to the Land for SELLER'S last 2 full fiscal years of operation plus the current fiscal year through present.  It shall be presumed that SELLER has delivered all of the foregoing documents and information prior to execution of this Agreement.  BUYER shall have three calendar days after execution of this Agreement to give written notice to SELLER of any documents and information required under this section VI.B which were not provided prior to execution (an "initial notice").  To the extent an initial notice is given with respect to any particular documents or information, SELLER shall make its best efforts to provide all such information within ten calendar days after execution of this Agreement by BUYER.  SELLER shall be presumed to have delivered all such documents and information (referenced in BUYER'S initial notice, if any) within ten calendar days after execution of this Agreement by BUYER.  BUYER shall have two calendar days after expiration of the ten-day period to give an additional written notice to SELLER of any required documents and information referenced in the initial notice which were not provided prior to expiration of the ten-day period.

C.    *Title Insurance Contingency.*  BUYER'S obligation to purchase the Assets is conditioned and contingent upon BUYER'S ability to obtain policies of title insurance with respect to the Land (excluding the New Mexico property and the time shares) which is devoid of any material exceptions or defects of title to which BUYER objects (the "Title Insurance Contingency").  One or more Commitments for Title Insurance (the "Title Commitments") shall be issued by the Escrow Agent, or such other title company (and underwriter) as selected by SELLER in its sole and absolute discretion, no later than ten days after this Agreement is signed by all Parties.

BUYER shall have ten (10) calendar days following its receipt of the Title Commitments (the "Title Deadline") to review the commitments and to determine whether there are any material exceptions or defects of title to which BUYER objects. If there are any material exceptions or defects of title to which BUYER timely objects, BUYER may cancel this Agreement by providing SELLER with written notification of cancellation together with notification of all material exceptions or defects of title to which BUYER objects (collectively, the "Cancellation Notice"); provided, however, that the Cancellation Notice must be delivered such that it is received by SELLER no later than 4:30 p.m. on the Title Deadline. ***BUYER'S failure to furnish a written Cancellation Notice on or before the Title Deadline conclusively shall be deemed BUYER'S election to waive the Title Insurance Contingency and to proceed with the transaction***.

If SELLER receives a Cancellation Notice from BUYER, SELLER, in its sole and absolute discretion, may elect:  (i) to accept termination of this Agreement (a) by communicating in writing SELLER'S concurrence in or acceptance of the cancellation, or (b) by taking no further action and making no further response to BUYER within five (5) calendar days after its receipt of the Cancellation Notice, whereupon SELLER'S concurrence and acceptance

shall be implied by SELLER'S silence and inaction; or (ii) to address BUYER'S objections regarding the condition of the title of the Property by delivering a written response to BUYER within five (5) calendar days after its receipt of the Cancellation Notice. If SELLER elects the latter, SELLER then shall have ten (10) addition days (or until fifteen (15) calendar days after SELLER'S receipt of the Cancellation Notice) either (y) to correct the deficiencies and/or defects identified in the Cancellation Notice, or (z) to enter into a written agreement with BUYER, signed by both parties, wherein BUYER and SELLER agree upon the manner for resolving BUYER'S objections. If SELLER is unable to resolve BUYER'S objections within said fifteen (15) day period, then the Agreement shall be deemed terminated and cancelled and the Earnest Money Deposit be refunded to BUYER.

     D.    *Due Diligence Contingency.*  BUYER'S obligation to purchase the Assets is conditioned and contingent upon the results of BUYER due diligence in inspecting the Assets to determine whether the Land and Personal Property is suitable, in its sole discretion, for BUYER'S intended purposes (collectively, the "<u>Due Diligence</u>"). Among other things, BUYER may, at its own expense, obtain an ALTA survey of the Land (the "<u>Survey</u>"). The deadline for BUYER to complete its Due Diligence and to provide notice to SELLER of cancellation is the date which is fourteen (14) calendar days after the later of (a) execution of this Agreement by both BUYER and SELLER, or (b) SELLER'S delivery of the items referenced in section VI.B of this Agreement (the "<u>Due Diligence Deadline</u>"). BUYER acknowledges that it is BUYER'S sole responsibility to obtain inspection reports by qualified professionals. BUYER may inspect, test, and survey the Land and other Assets and any and all portions thereof, including physical and mechanical inspections. BUYER shall give advance notice to SELLER prior to making any inspections so that SELLER can make arrangements to provide BUYER and its professionals with access to the Land. Arrangements to permit BUYER and its professionals to visit and inspect the RV Resorts shall be made with Mark Makin or other person designated by SELLER. Notwithstanding the foregoing, Buyer must obtain Seller's prior written approval (which will not be withheld or delayed unreasonably) of the scope and method of any environmental testing or investigation (other than a Phase I environmental site assessment, which shall require no consent or approval of any kind).

     If BUYER determines that the condition of the Land or any other Due Diligence matters are not satisfactory to BUYER, then BUYER may cancel this Agreement by providing SELLER with written notification of cancellation together with notification of all material exceptions (collectively, the "<u>Cancellation Notice</u>"); provided, however, that the Cancellation Notice must be delivered such that it is received by SELLER no later than 4:30 p.m. on the Due Diligence Deadline. ***<u>BUYER'S failure to furnish a written Cancellation Notice on or before the Due Diligence Deadline conclusively shall be deemed BUYER'S election to waive the Due Diligence contingency and to proceed with the transaction</u>***.

     If SELLER receives a Cancellation Notice from BUYER pursuant to the preceding section, SELLER, in its sole and absolute discretion, may elect: (i) to accept termination of this Agreement (a) by communicating in writing SELLER'S concurrence in or acceptance of the cancellation, or (b) by taking no further action and making no further response to BUYER within five (5) calendar days after its receipt of the Cancellation Notice, whereupon SELLER'S concurrence and acceptance shall be implied by SELLER'S silence and inaction; or (ii) to address BUYER'S objections regarding the condition of the Land or other Assets by delivering a written response to BUYER within five (5) calendar days after its receipt of the Cancellation Notice. If SELLER elects the latter, SELLER then shall have ten (10) additional days (or until fifteen (15) calendar days after SELLER'S receipt of the Cancellation Notice)

either (y) to correct the deficiencies and/or defects identified in the Cancellation Notice, or (z) to enter into a written agreement with BUYER, signed by both parties, wherein BUYER and SELLER agree upon the manner for resolving BUYER'S objections. If SELLER is unable to resolve BUYER'S objections within said fifteen-day period, then the Agreement shall be deemed terminated and cancelled.

## ARTICLE VII: CLOSING

A.    *Escrow Agent; Closing Agent.*  Seller has opened (or, within five (5) days after execution of this Agreement by Buyer, will open) title or escrow with (the "Escrow Agent" or "Closing Agent"):

> Title West Title Company
> Jeff Merrill
> OLD REPUBLIC TITLE
> 11820 South State Street, Suite 330
> Draper, UT  84010
>
> Telephone:  (801) 285-8733
> Facsimile:  (801) 285-8740
> E-Mail:  jmerrill@oldrepublictitle.com

It shall be the responsibility of Buyer to schedule with the Closing Agent a settlement date on or before the Settlement Deadline (as defined below).

B.    *Closing.*  "Closing" shall be deemed to have occurred when (a) all monies required to be paid by BUYER under the Agreement have been delivered by BUYER to the Escrow Agent in the form of collected and cleared funds; (b) all applicable deeds, bills of sale and other documents necessary to convey the Assets have been executed by SELLER (and any other necessary parties) and, in the case of Land, recorded in the appropriate county offices. Taxes and assessments for the year 2017 shall not be prorated as of Closing.  Taxes for the year 2016 (any prior years) shall be paid at Closing from the Cash Proceeds.  BUYER shall be responsible for taxes due or coming due for 2017.

C.    *Closing Deadline.*  Unless BUYER shall have exercised a right to cancel this Contract as provided in sections 4.C and/or 4.D, above, BUYER shall pay the Purchase Price, and SELLER and BUYER shall perform all other actions necessary to permit the Closing to occur, no later than five (5) business days after the Due Diligence Deadline (the "Settlement Deadline" or the "Closing Deadline").  Unless excused by failure of a condition or contingency which is not deemed waived, the failure or refusal to close, by either party, after all conditions precedent to Closing have been performed, shall constitute a default.

D.    All fees due to the Escrow Agent, and all other closing and escrow costs, shall be paid from the Cash Proceeds at the time of Closing.

E.    *Seller's Closing Deliveries.*  SELLER shall make the following deliveries at Closing (or at such other time as specified below):

> 1.    a special warranty deed as to each parcel of Land and any other Asset that constitutes, and must be conveyed as, real property;
>
> 2.    a bill of sale covering the Personal Property;

      3.     an assignment of intangible assets as to any personal property that is intangible; and

      4.     Within twenty calendar days after Closing, copies of SELLER'S books, records, lists and other documents relating to Members and the operation of SELLER'S business activities.

F.    *Buyer's Closing Deliveries.* Buyer shall make the following deliveries at Closing (or at such other time as specified below):

      1.     cash in the amount of the Purchase Price;

G.    Within twenty calendar days after Closing, copies of SELLER'S books, records, lists and other documents relating to Members and the operation of SELLER'S business activities.

## ARTICLE VIII: SELLER'S LIMITED WARRANTIES

The SELLER warrants and represents to BUYER with knowledge, and BUYER may rely on the same to enter into this transaction, each and all of the following:

1.     SELLER is the successor-in-interest to Camperworld BT and Camperworld UI pursuant to the terms of the Confirmation Order and the Confirmed Plan.

2.     This Agreement has been approved by SELLER'S board of directors, and the signature of SELLER hereon has been authorized by resolution of the Board. Subject to the conditions described in Article V (including that this Agreement must be approved by the "members" of SELLER in a duly noticed special or annual meeting), SELLER has the full power and authority to enter into this Agreement and to conclude the transaction described herein, and no other contract or agreement to which it is a party prevents it from concluding the transaction described herein.

3.     Excepting any defects disclosed as part of the property condition disclosures that have been, or will be, made pursuant to section VI.B, SELLER is not aware of any substantial latent defects (i.e., defects that cannot be observed or determined through a competent and thorough inspection) in the Land and other Assets.

4.     SELLER shall not, without the prior written consent of BUYER: (a) make any changes in any existing memberships or leases; (b) enter into any new memberships or leases; (c) make any substantial alterations or improvements to the Land and Assets; or (d) incur any further financial encumbrances against the Land. Notwithstanding the foregoing, SELLER reserves its right to enter into new long term rental or lease agreements for portions or parcels of the Land.

5.     SELLER does not make, and has not made, to BUYER any other representations or warranties, express or implied.

BUYER hereby affirms that SELLER (including SELLER'S agents, attorneys and other representatives) has not made, nor has BUYER relied upon, any representation, warranty, or promise with respect to Assets (including the Land and Personal Property), any improvements or fixtures located upon the Land, or any other subject matter of the Agreement, including, without limitation, any warranties or representations, expressed or implied, as to (a) the general plan

designation, zoning, subdivision, permitted uses, tax status, physical condition or value of the Land, or any part thereof, (b) the existence or non-existence of any hazardous materials or environmental contaminants on or under the Land, (c) the accuracy of any survey, soils report, appraisal or other plan or report with respect to Land, and (d) the condition of improvements, fixtures, personal property, title to personal property or whether any personal property is encumbered by liens.  In this regard, SELLER may have shared (purely for information purposes) its understanding or beliefs regarding the Assets and may also have shared certain reports, plans, designs or documents relating to the Assets which SELLER may have prepared for or obtained from other persons.  BUYER, however, expressly acknowledges and understands that no information, report or document of any kind provided by SELLER shall constitute a representation or warranty regarding the Assets, and that it would not be reasonable for BUYER to rely on such information, report or document.  Further, BUYER acknowledges that BUYER has not relied, and that it would not be reasonable for BUYER to rely, upon any oral or written statements, information, reports, documents, representations or warranties by SELLER regarding the condition of the Assets or matters relating thereto.

## ARTICLE IX:  BUYER'S LIMITED WARRANTIES

BUYER warrants and represents to SELLER with knowledge, and SELLER may rely on the same to enter into this transaction, each and all of the following:

1.      BUYER has the full power and authority to enter into this Agreement and to conclude the transaction described herein, and no other contract or agreement to which it is a party prevents it from concluding the transaction described herein.

2.      Subject to its right to cancel the Agreement if its Due Diligence discloses a material defect in the condition of the Assets, BUYER intends in good faith to proceed with the purchase of the Assets according to the terms of this Agreement.

3.      SELLER agrees to cooperate with BUYER to prepare and send notice of this transaction to its members, and to communicate with Members regarding the details of the anticipated transaction.

4.      BUYER shall attend the special meeting of Members, and to assist SELLER to respond to or address, in writing or at the meeting, all correspondence and inquiries from Members regarding the transactions contemplated under this Agreement.

5.      BUYER has the financial wherewithal to pay and deliver the Purchase Price, without the need to obtain financing or further investment, as well as the wherewithal to property capitalize the New Membership Company shall such that all of the RV Resorts that BUYER is purchasing hereunder will be open to Founding Members in 2017 and 2018.

6.      BUYER incorporates by reference, as if restated herein, all express representations and warranties plainly stated in other sections of this Agreement, including without limitation representations and warranties under section III.D.

7.      The New Membership Company shall be operated consistent with the terms described on Schedule III.D hereto.

8.      SELLER does not make, and has not made, to BUYER any other representations or warranties, express or implied.

## ARTICLE X:  POSSESSION

SELLER agrees and covenants that it shall deliver possession of the Acquired Assets effective as of 12:01 a.m. on the day immediately following the Closing (the "Date of Possession").

## ARTICLE XI:  DEFAULT AND DEFAULT REMEDIES

If either party defaults in the performance of their obligations under this Contract, each parties' respective remedies shall be as set forth hereinafter:

A.      *Default by Seller.* If the sale contemplated hereby is not consummated because of a default by SELLER in its obligation to sell and convey the Assets in accordance with the terms of this Agreement after BUYER has performed or tendered performance of all of its obligations in accordance with this Agreement, and if such failure continues for more than ten (10) business days after delivery to SELLER of written notice, then BUYER, as its sole and exclusive remedy, may exercise any one of the following three alternative remedies: (i) waive such failure and proceed to the Closing with no reduction in the Purchase Price; (ii) terminate this Agreement by notice to SELLER and the Closing Agent and recover the full amount of the Earnest Money Deposit; or (iii) sue SELLER for specific performance of this Agreement.  BUYER'S election of any one of the foregoing remedies shall constitute a waiver of all other possible remedies.  In the event BUYER, elects the remedies specified in sub-clauses (i) or (ii) of this section, BUYER waives any right to an action for specific performance of any provisions of this Agreement.

B.      *Default by Buyer.* If the sale contemplated hereby is not consummated because of a default by BUYER in its obligation to pay the Purchase Price or make other Closing deliveries in accordance with the terms of this Agreement after SELLER has performed or tendered performance of all of its obligations in accordance with this Agreement, and if such failure continues for more than ten (10) business days after delivery to BUYER of written notice, then SELLER, as its sole and exclusive remedy, may terminate this Agreement and thereupon shall be entitled to the Earnest Money Deposit as liquidated damages (and not as a penalty).  SELLER and BUYER have made this provision for liquidated damages because it would be difficult to calculate, on the date hereof, the amount of actual damages for such default, and SELLER and BUYER agree that these sums represent reasonable compensation to SELLER for such breach. SELLER hereby waives any right to an action for specific performance of any provisions of this Agreement.

C.      *Attorneys' Fees and Costs.*  In the event of litigation or arbitration to enforce this Agreement, the prevailing party shall be entitled to recover all costs and reasonable attorneys' fees incurred by it.

## ARTICLE XII:  MISCELLANEOUS

A.      *Time of Essence.*  It is expressly agreed that time is of the essence of all provisions of this Agreement.

B.      *Buyer Has No Right to Encumber Property.*  BUYER agrees that it shall *not*, under any circumstances, record a notice of interest, lien, encumbrance, lis pendens, notice of

option or any other document (including a copy of this Agreement) against the Land or other Assets in the real property records or in any other public registers.

C.     *Confirmation of Brokerage Fees and Commissions.*  BUYER has not entered into a buyer-broker agreement, an exclusive agency agreement or any other type of agency agreement with any real estate agent, real estate broker or finder.  BUYER has not involved any brokers or finders in the transaction contemplated by this Agreement.  SELLER, however, has entered into a listing agreement, an exclusive right to sell agreement and/or type of agency agreement(s) with licensed agents and brokers (collectively, "Seller's Broker"), and may be obligated to pay a commission to Seller's Broker.  The commissions due to Seller's Broker (in the amount specified in SELLER'S contracts with Seller's Broker or in such lesser amount as either BUYER or SELLER may negotiate) shall be paid at Closing from the Cash Proceeds.

D.     *Agency Disclosure.*  BUYER'S Principal, Tom Souvall, is a licensed real estate agent.  SELLER acknowledges that Mr. Souvall's status as a licensed real estate professional was disclosed to SELLER immediately upon initiation of the discussions which have resulted in this Agreement.  SELLER has an existing listing agreement or exclusive agency agreement with Judd Tidwell and Mark Jensen, as agents, and _____, as broker, as well as Newmark Grubb Acres as Real Estate Company.

E.     *Escrow Instructions.*  The Parties acknowledge that this Agreement shall serve as the escrow instructions to Escrow Agent and that they shall execute such other documents as Escrow Agent deems necessary to perform its duties pursuant to this Agreement.

F.     *Notices.*  All notices and communications required to be given under this Agreement shall be in writing and must be delivered by (i) e-mail, (ii) hand-delivery, (iii) by certified or registered United States mail, postage prepaid, or (iv) by private courier or delivery service to:

if to BUYER:

SOUVALL MANAGEMENT, INC.
Attn:  Tom Souvall
_____
_____
Facsimile:_____
E-Mail:_____

If to SELLER:

> CAMPERWORLD, INC.
> Attn:  Mark Makin and Diane Williams
> PO Box 879
> West Jordan, UT  84084
> Facsimile:  801.255.8166
> E-Mail:  mjm56@comcast.net and diane@retralia.com and
> boardofdirectors@retrailia.com

With a copy to:

> Matthew M. Boley
> COHNE KINGHORN, P.C.
> 111 East Broadway, 11th Floor
> Salt Lake City, UT  84111
> Facsimile:  801.363.4378
> E-Mail:  mboley@cohnekinghorn.com

Or to such other address as the Parties may, from time to time, designate in writing and deliver in the manner set forth above.  Notices shall become effective as follows:  (a) upon sending by e-mail or facsimile, (b) upon actual receipt if delivered in person; (c) one day after deposit prepaid with a national overnight express delivery service; or (d) seventy-two (72) hours after deposit in the United States mail, addressed as set forth above.

G.      *Incorporation of Exhibits and Schedules.*  The Exhibits and Schedules referenced in and/or attached to this Agreement are incorporated by reference.

H.      *Execution of Additional Documents.*  Each of the Parties understands there may be additional documents to sign.  The Parties agree to execute and deliver any and all additional papers, documents, instruments, and other assurances, and shall do any and all acts and things reasonably necessary, in connection with the performance of its obligations hereunder, to carry out the intent of the Parties.  Among other things, each Party agrees and covenants to cooperate fully with the other Party and to sign and deliver, in a timely manner, such additional documents as such Party reasonably may prepare or request.

I.      *Reasonably Equivalent Value.*  Each of BUYER and SELLER represent and warrant to the other: (a) it is fully satisfied with the consideration that it will receive in exchange for the Purchase Price and/or the sale and transfer of the Acquired Assets, as the case may be (the "Consideration"); (b) it has researched the fair value of the Acquired Assets; and (c) that that the Consideration constitutes reasonably equivalent value.  In making these acknowledgements, BUYER and SELLER realize that it is possible that the Acquired Assets might appraise for an amount greater or lesser than the Purchase Price.

J.      *Relationship of the Parties.*  The relationship between BUYER and SELLER is an arms-length contractual relationship, and is not fiduciary in nature.  The transfer of the Acquired Assets will not be deemed to create a partnership or joint venture, or to give rise to fiduciary duties, or to (excepting only those debts and liabilities of SELLER that BUYER expressly has covenanted to pay) be liable or responsible in any way for the actions, liabilities, debts or obligations of the other.

K.    *Binding Effect.*  This Agreement is binding upon and shall inure to the benefit of the Parties and their respective heirs, successors, permitted assigns, officers, directors, employees, agents, representatives, subrogees and to all persons or entities claiming by, through or under them.

L.    *Assignment.*  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; provided, however, that the approval of SELLER shall not be withheld unreasonably if BUYER'S assignee is under common ownership or control with BUYER.

M.    *Entire Agreement.*  This Agreement represents the entire understanding between the Parties with respect to the subject matter herein, and supersedes all prior oral or written agreements and understandings relating to the subject matter hereof.  There are no written or oral agreements between the Parties which are not set forth herein.  The Parties and their agents have not made any representations or promises or provided any inducements other than as specifically described herein.  There are no unresolved issues, no side agreements, and no terms beyond or different from those described herein.  No statement, representation, warranty, covenant or agreement of any kind not expressly set forth in this Agreement or expressly incorporated by reference shall affect, or be used to interpret, change or restrict, the express terms and provisions of this Agreement.

N.    *Amendment.*  Neither this Agreement nor any provisions hereof may be changed, discharged or terminated orally, and may be modified or amended only by an instrument in writing, signed by all Parties.

O.    *Waiver.*  The rights of and available to each of the Parties under this Agreement cannot be waived or released orally, and may be waived or released only by an instrument in writing, signed by the Party whose rights will be diminished or adversely affected by the waiver. The failure at any time or times hereafter by a Party to require strict performance by the other Party of any of the undertakings, agreements or covenants contained in this Agreement shall not waive, affect or diminish any right of BUYER or SELLER, as the case may be, to demand strict compliance and performance thereafter.

P.    *Transactional Expenses.*  The Parties hereto shall be responsible for their own respective attorneys' fees, expenses and costs, including but not limited to any attorneys' fees, expenses or costs incurred in connection with the negotiation of this Agreement, due diligence regarding the proposed transaction, and/or performance at closing or immediately following closing of the transactions contemplated by this Agreement.  Notwithstanding the foregoing, SELLER'S attorneys' fees and costs shall be paid from the Cash Proceeds at Closing.

Q.    *Choice of Law.*  This Agreement and all matters relating hereto shall be governed by, construed, and interpreted in accordance with the laws of the State of Utah, without reference to conflict of law principles.

R.    *Bulk Transfer Laws.*  BUYER acknowledges that SELLER will not comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the transactions contemplated by this Agreement.

S.    *Construction.*  This Agreement is the result of negotiations between the Parties. Accordingly, this Agreement shall not be construed for or against any Party, regardless of which Party drafted this Agreement or any part hereof.  The headings at the beginning of each paragraph of this Agreement are solely for convenience and are not part of this Agreement. Unless the context requires otherwise, singular nouns and pronouns used in this Agreement shall be deemed to include the plural, and pronouns of one gender or the neuter shall be deemed to include the equivalent pronouns of the other gender or the neuter.  Further, the term "person" shall encompass and refer to both natural born persons as well as corporations, limited liability companies, partnerships, trusts, estates and any other organization or entity having a legal existence.

T.    *Survival of Representations and Warranties.*  All of the representations, warranties, covenants, and agreements expressly stated in this Agreement and in any certificate, schedule, document, or other writing delivered pursuant to this Agreement and/or at closing have been relied upon and shall survive the closing and the execution of the Exhibits to this Agreement.  The parties hereto in executing, and in carrying out the provisions of, this Agreement are relying solely on the representations, warranties and agreements contained in this Agreement or in any writing delivered at closing, and not upon any verbal (at any time) or other written representation, warranty, agreement, promise or information made by any person other than as expressly set forth herein or the exhibits hereto.

U.    *No Third-Party Beneficiaries.*  This Agreement shall not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns.

V.    *Authorization.*  The persons executing this Agreement on behalf of a Party hereby represent and warrant that they are duly authorized and empowered to execute the same, that they have carefully read this Agreement, and that this Agreement represents a binding and enforceable obligation of such Party, subject only to the express contingencies specified in this Agreement.

W.    *Counterparts.*  This Agreement may be executed in counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same Agreement.  Each party shall be authorized to accept, and may rely upon, signatures delivered or transmitted by electronic transmission (*e.g.*, by facsimile or e-mail), and such document shall be binding upon the executing party.  Signatures transmitted by facsimile and/or e-mail shall have the same force and effect as original signatures.

IN WITNESS WHEREOF, the Parties have made and executed this Agreement as of the date first above written.

SELLER:                          CAMPERWORLD, INC., a Utah non-profit
                                 corporation

                                 By _____ Mark Makin
                                    Mark Makin, Chairperson

                                 By _____
                                    Ed Askew, Vice-Chair

                                 By _____
                                    Robert Schouten, Treasurer

                                 By _____
                                    Juanita Hales, Secretary

                                 By _____
                                    Paul Hales, Board Member

                                 By _____
                                    Albert Jeffery, Board Member

                                 By _____
                                    Howard Smith, Board Member

                                 By _____ 5/25/17 Brent Thackeray
                                    Brent Thackeray, Board Member

                                 By _____
                                    Diane Williams, President/CEO


BUYER:                           SOUVALL MANAGEMENT, INC., a Utah corporation

                                 By _____
                                    Tom Souvall
                                    Its:


{00328363.DOC /}                 19

IN WITNESS WHEREOF, the Parties have made and executed this Agreement as of the date first above written.

SELLER:                          CAMPERWORLD, INC., a Utah non-profit corporation

By_____
Mark Makin, Chairperson

By_____
Ed Askew, Vice-Chair

By_____
Robert Schouten, Treasurer

By_____
Juanita Hales, Secretary

By_____
Paul Hales, Board Member

By_____
Albert Jeffery, Board Member

By_____
Howard Smith, Board Member

By_____
Brent Thackeray, Board Member

By_____
Diane Williams, President/CEO


BUYER:                           SOUVALL MANAGEMENT, INC., a Utah corporation

By_____
Tom Souvall
Its:

IN WITNESS WHEREOF, the Parties have made and executed this Agreement as of the date first above written.

SELLER:

CAMPERWORLD, INC., a Utah non-profit corporation

By_____
Mark Makin, Chairperson

By_____
Ed Askew, Vice-Chair

By_____
Robert Schouten, Treasurer

By_____
Juanita Hales, Secretary

By_____
Paul Hales, Board Member

By_____
Albert Jeffery, Board Member

By_____
Howard Smith, Board Member

By_____
Brent Thackeray, Board Member

By_____
Diane Williams, President/CEO

BUYER:

SOUVALL MANAGEMENT, INC., a Utah corporation

By_____
Tom Souvall
Its:

{00328363.DOC /}                    19

IN WITNESS WHEREOF, the Parties have made and executed this Agreement as of the date first above written.

SELLER:

**CAMPERWORLD, INC.**, a Utah non-profit corporation

By_____
   Mark Makin, Chairperson

By_____
   Ed Askew, Vice-Chair

By_____
   Robert Schouten, Treasurer

By_____
   Juanita Hales, Secretary

By_____
   Paul Hales, Board Member

By_____
   Albert Jeffery, Board Member

By_____
   Howard Smith, Board Member

By_____
   Brent Thackeray, Board Member

By_____
   Diane Williams, President/CEO

BUYER:

**SOUVALL MANAGEMENT, INC.**, a Utah corporation

By_____
   Tom Souvall
   Its:

{00328363.DOC /}                          19

IN WITNESS WHEREOF, the Parties have made and executed this Agreement as of the date first above written.

SELLER:                              **CAMPERWORLD, INC.,** a Utah non-profit
                                     corporation

                                     By_____
                                       Mark Makin, Chairperson

                                     By_____
                                       Ed Askew, Vice-Chair

                                     By_____
                                       Robert Schouten, Treasurer

                                     By_____
                                       Juanita Hales, Secretary

                                     By_____
                                       Paul Hales, Board Member

                                     By_____
                                       Albert Jeffery, Board Member

                                     By_____
                                       Howard Smith, Board Member

                                     By_____
                                       Brent Thackeray, Board Member

                                     By_____
                                       Diane Williams, President/CEO


BUYER:                               **SOUVALL MANAGEMENT, INC.,** a Utah corporation

                                     By_____
                                       Tom Souvall
                                       Its:

{00328363.DOC /}                     19

IN WITNESS WHEREOF, the Parties have made and executed this Agreement as of the date first above written.

SELLER:                                  **CAMPERWORLD, INC.**, a Utah non-profit corporation

By_____
    Mark Makin, Chairperson

By_____
    Ed Askew, Vice-Chair

By_____
    Robert Schouten, Treasurer

By_____
    Juanita Hales, Secretary

By_____
    Paul Hales, Board Member

By _Albert J. Jeffery_____
    Albert Jeffery, Board Member

By_____
    Howard Smith, Board Member

By_____
    Brent Thackeray, Board Member

By_____
    Diane Williams, President/CEO

BUYER:                                   **SOUVALL MANAGEMENT, INC.**, a Utah corporation

By_____
    Tom Souvall
    Its:

   IN WITNESS WHEREOF, the Parties have made and executed this Agreement as of the date first above written.

   SELLER:

       **CAMPERWORLD, INC.**, a Utah non-profit corporation

By_____
 Mark Makin, Chairperson

By_____
 Ed Askew, Vice-Chair

By_____
 Robert Schouten, Treasurer

By_____
 Juanita Hales, Secretary

By_____
 Paul Hales, Board Member

By_____
 Albert Jeffery, Board Member

By_____
 Howard Smith, Board Member

By_____
 Brent Thackeray, Board Member

By *Diane Williams*
 Diane Williams, President/CEO

   BUYER:

       **SOUVALL MANAGEMENT, INC.**, a Utah corporation

By_____
 Tom Souvall
 Its:

{00328363.DOC /}

       19

**Camperworld**
Fixed Asset Schedule
December 31, 2016

| Location | Type | Asset Description |
|----------|------|-------------------|
| **_Buildings_** | | |
| Bear Lake | Buildings | Original Main Bldg |
| Bear Lake | Buildings | Bath House |
| Bear Lake | Buildings | Garage |
| Bear Lake | Buildings | Steel Bldg |
| Bear Lake | Buildings | Residence - Mgr Qtrs |
| Bear Lake | Buildings | Restrooms/showers |
| Bear Lake | Buildings | Restrooms/showers |
| Bear Lake | Buildings | Restrooms/showers |
| Bear Lake | Buildings | Home 06-85 |
| Bear Lake | Buildings | Home Referbish |
| Bear Lake | Buildings | Raingutter/Siding |
| Bear Lake | Buildings | Garage |
| Bear Lake | Buildings | Restroom Roof |
| Bear Lake | Buildings | Restroom Tile |
| Bear Lake | Buildings | Mgr Qtrs Remodel |
| Echo | Buildings | Lift Station |
| Echo | Buildings | Pumphouse |
| Echo | Buildings | Utility Bldg |
| Echo | Buildings | Restrooms/showers |
| Echo | Buildings | Pumphouse |
| Echo | Buildings | Restrooms/Pool house |
| Echo | Buildings | Storage Bldg |
| Echo | Buildings | Restroom remodel |
| Echo | Buildings | Mobile Home Residence |
| Echo | Buildings | Restroom remodel |
| Echo | Buildings | Pavillion |
| Hot Springs | Buildings | Original Purchase |
| Hot Springs | Buildings | Lodge/RestroomRemodel |
| Hot Springs | Buildings | Mgr Residence |
| Hot Springs | Buildings | Lodge/RestroomRemodel |
| Hot Springs | Buildings | Sheds, |
| Knotty Pine | Buildings | Lodge Remodel |
| Knotty Pine | Buildings | Lodge & Restrooms |
| Knotty Pine | Buildings | Restrooms/showers |
| Knotty Pine | Buildings | Manager Quarters |
| Knotty Pine | Buildings | Lodge Remodel |
| Knotty Pine | Buildings | Restroom Remodel |
| Knotty Pine | Buildings | Mgr Quarters Remodel |
| Knotty Pine | Buildings | Check-in Booth |
| Knotty Pine | Buildings | Lodge Remodel |
| Knotty Pine | Buildings | Pumphouse Annex |
| Knotty Pine | Buildings | KP Home |
| Knotty Pine | Buildings | Restroom & Equip bldg |
| Knotty Pine | Buildings | Upgrade |
| Knotty Pine | Buildings | Cabin |
| Lakeside | Buildings | Log Cabin |
| Lakeside | Buildings | Storage Shed |
| Lakeside | Buildings | Storage Shed Add On |
| Lakeside | Buildings | Manager Qtrs |
| Lakeside | Buildings | Manager Qtrs |
| Lakeside | Buildings | Restrooms/store |
| Lakeside | Buildings | Restrooms/showers |
| Lakeside | Buildings | Lodge Remodel |
| Lakeside | Buildings | Restrooms |
| Lakeside | Buildings | Mobile Home Remodel |
| Lakeside | Buildings | Mobile Home Remodel |
| Lakeside | Buildings | Mgr Qtrs Remodel |
| Pleasant Creek | Buildings | Original Main Bldg |

**Camperworld**
Fixed Asset Schedule
December 31, 2016

| Location | Type | Asset Description |
|---|---|---|
| Pleasant Creek | Buildings | Purchase |
| Pleasant Creek | Buildings | Restrooms/Store |
| Pleasant Creek | Buildings | Resident Mgr Qtrs |
| Pleasant Creek | Buildings | "      " |
| Pleasant Creek | Buildings | Lodge |
| Pleasant Creek | Buildings | Restrooms/Showers |
| Pleasant Creek | Buildings | Boiler Bldg Siding |
| Pleasant Creek | Buildings | Lodge Remodel |
| Pleasant Creek | Buildings | Office Siding |
| Pleasant Creek | Buildings | Restroom Renovation |
| Pleasant Creek | Buildings | cabin |

*Total Buildings*

*Equipment*

| Location | Type | Asset Description |
|---|---|---|
| General | Equipment | 5 Drawer Lat File |
| General | Equipment | 2 - Letter File Cab |
| General | Equipment | File Cabinet |
| General | Equipment | 2 - File Cabinet |
| General | Equipment | File Cabinets |
| General | Equipment | Computer Software |
| General | Equipment | Computer Software |
| General | Equipment | Equipment |
| General | Equipment | Truck - General |
| General | Equipment | Truck - General |
| General | Equipment | Equipment |
| General | Equipment | |
| General | Equipment | Computers |
| Bear Lake | Equipment | 20 Picnic tables |
| Bear Lake | Equipment | 10 Picnic Tables |
| Bear Lake | Equipment | Restrm Prop w/heater |
| Bear Lake | Equipment | "   "  prop tanks |
| Bear Lake | Equipment | Garden Trailer |
| Bear Lake | Equipment | Equipment |
| Bear Lake | Equipment | Equipment |
| Bear Lake | Equipment | Equipment |
| Echo | Equipment | Fences & Sign /front |
| Echo | Equipment | Pool Pump |
| Echo | Equipment | Water Heater |
| Echo | Equipment | Post Hole Digger |
| Echo | Equipment | 20 PicnicTables(green) |
| Echo | Equipment | '00 Kubata B2910 |
| Echo | Equipment | Chlorinator System |
| Echo | Equipment | Picnic tables |
| Echo | Equipment | Fence |
| Echo | Equipment | Pool Pump |
| Echo | Equipment | Water Heater |
| Echo | Equipment | Picnic tables |
| Echo | Equipment | Pumps |
| Echo | Equipment | Trailer Attachment |
| Echo | Equipment | Storage Shed |
| Echo | Equipment | Work Cart |
| Echo | Equipment | Equipment |
| Echo | Equipment | Equipment |
| Echo | Equipment | Pool |
| Echo | Equipment | Equipment |
| Hot Springs | Equipment | Pool Pumps |
| Hot Springs | Equipment | Pool Renovaton |

**Camperworld**
Fixed Asset Schedule
December 31, 2016

| Location | Type | Asset Description |
|----------|------|-------------------|
| Hot Springs | Equipment | Septic Tank |
| Hot Springs | Equipment | Gas Storage Tank |
| Hot Springs | Equipment | KubotaTractor L3430 |
| Hot Springs | Equipment | Deck & Spa |
| Hot Springs | Equipment | Spa |
| Hot Springs | Equipment | Home Air Conditioner |
| Hot Springs | Equipment | Lodge Air Conditioner |
| Hot Springs | Equipment | KubotaTractor |
| Hot Springs | Equipment | Fire Rings |
| Hot Springs | Equipment | Water Traps |
| Hot Springs | Equipment | Signs |
| Hot Springs | Equipment | Washer/Dryer |
| Hot Springs | Equipment | Pool Stair Railings |
| Hot Springs | Equipment | Scuba Deck |
| Hot Springs | Equipment | Basketball Court |
| Hot Springs | Equipment | Tables & Benches |
| Hot Springs | Equipment | Gazabo |
| Hot Springs | Equipment | Cutting Torch |
| Hot Springs | Equipment | Lodge Lighting |
| Hot Springs | Equipment | Greenmaster Mower |
| Hot Springs | Equipment | Storage Bldg |
| Hot Springs | Equipment | Sprinklers |
| Hot Springs | Equipment | Equipment |
| Hot Springs | Equipment | Equipment |
| Knotty Pine | Equipment | Wooden Rail Fence |
| Knotty Pine | Equipment | 5 Picnic Tab-(Red Alum) |
| Knotty Pine | Equipment | 3 Picnic Tab-redwood |
| Knotty Pine | Equipment | Water Tank |
| Knotty Pine | Equipment | 42" Oak Table (rnd) |
| Knotty Pine | Equipment | 4 Side Chairs (oak) |
| Knotty Pine | Equipment | Oak end table |
| Knotty Pine | Equipment | 87Grasshppr1822DMower |
| Knotty Pine | Equipment | JVC VCR |
| Knotty Pine | Equipment | JVC TV |
| Knotty Pine | Equipment | DSS System |
| Knotty Pine | Equipment | 4 Picnic Tab-GrPlastic |
| Knotty Pine | Equipment | Carpet in Lodge |
| Knotty Pine | Equipment | 19hp Generator |
| Knotty Pine | Equipment | Kubota L48 #51575 |
| Knotty Pine | Equipment | " LoaderTL1150#11809 |
| Knotty Pine | Equipment | " BachoeBT1100#11620 |
| Knotty Pine | Equipment | " Trailer #1810 |
| Knotty Pine | Equipment | " Scraper#BB3683 |
| Knotty Pine | Equipment | Fence |
| Knotty Pine | Equipment | Kuboa Forks |
| Knotty Pine | Equipment | 99 Chev Dump Truck |
| Knotty Pine | Equipment | Cargo Trailer |
| Knotty Pine | Equipment | 13 Picnic Tables |
| Knotty Pine | Equipment | Tables |
| Knotty Pine | Equipment | Kubota Tractor Cab |
| Knotty Pine | Equipment | Pump in Well |
| Knotty Pine | Equipment | Porch Railing |
| Knotty Pine | Equipment | Water Tank |
| Knotty Pine | Equipment | Pool Filter |
| Knotty Pine | Equipment | Powerwasher |
| Knotty Pine | Equipment | Basketball Stndrd |
| Knotty Pine | Equipment | Furnace |
| Lakeside | Equipment | Mobile Home |
| Lakeside | Equipment | Water Well |
| Lakeside | Equipment | Pool Table |

**Camperworld**
Fixed Asset Schedule
December 31, 2016

| Location | Type | Asset Description |
|---|---|---|
| Lakeside | Equipment | 4 Kitchen Chairs |
| Lakeside | Equipment | Oak Kitchen Table |
| Lakeside | Equipment | Washer/Dryer |
| Lakeside | Equipment | 4 Picnic Tables |
| Lakeside | Equipment | Work Patio |
| Lakeside | Equipment | Equipment |
| Lakeside | Equipment | Equipment |
| Lakeside | Equipment | Equipment |
| Pleasant Creek | Equipment | Pool Solar Heat Sys |
| Pleasant Creek | Equipment | Pool Solar Heaters |
| Pleasant Creek | Equipment | 1979 JD Rdng Mower |
| Pleasant Creek | Equipment | 1977Ariens SnoBlow#017747 |
| Pleasant Creek | Equipment | 30 Picnic Tables |
| Pleasant Creek | Equipment | 30 Picnic Tables |
| Pleasant Creek | Equipment | Solid Oak Table |
| Pleasant Creek | Equipment | 6 Oak Side Chairs |
| Pleasant Creek | Equipment | Basketball Standard |
| Pleasant Creek | Equipment | 32"Hitachi TV V7D023561 |
| Pleasant Creek | Equipment | MF165Tractorw/loader&blade |
| Pleasant Creek | Equipment | Shed |
| Pleasant Creek | Equipment | PropaneShowerWaterhtr |
| Pleasant Creek | Equipment | Lodge Raingutter |
| Pleasant Creek | Equipment | Pool Heaters |
| Pleasant Creek | Equipment | Water Tank |
| Pleasant Creek | Equipment | Signs |
| Pleasant Creek | Equipment | Tile/Laundry Room |
| Pleasant Creek | Equipment | Solar Panels |
| Pleasant Creek | Equipment | Pavillion |
| Pleasant Creek | Equipment | 24 Picnic tables |
| Pleasant Creek | Equipment | Picnic Tables |
| Pleasant Creek | Equipment | Equipment |
| Pleasant Creek | Equipment | Equipment |
| Pleasant Creek | Equipment | Equipment |
| Pleasant Creek | Equipment | Laundry Machines |
| General | Equipment | Laptop for Sale Manager (Beau White) |
| General | Equipment | Server - 8 bay, 16 GB LSI Raid, 1600 MHz, 2 SSD |
| General | Equipment | Server Rack |
| Apple Garden | Equipment | Stoves and Dishwasher |
| Apple Garden | Equipment | |
| Zions Gate | Equipment | Laptop for Zions Gate |
| Lakeside | Equipment | New pump for well at Lakeside |
| Knotty Pine | Equipment | 2 bladder bag water tanks - 10 year life |
| Pleasant Creek | Equipment | New pump for well at Pleasant Creek |

*Total Equipment*

*Improvements*

| Bear Lake | Improvements | Original Purchase |
|---|---|---|
| Bear Lake | Improvements | Campsite Improvement |
| Bear Lake | Improvements | 06/80 Water, Sewer |
| Bear Lake | Improvements | 09/80 Sprinkler Sys |
| Bear Lake | Improvements | Sewer |
| Bear Lake | Improvements | Sprinklers |
| Bear Lake | Improvements | Sewer |
| Bear Lake | Improvements | Patio |
| Bear Lake | Improvements | 200 Dogwood Trees |
| Bear Lake | Improvements | Waterline |
| Bear Lake | Improvements | Roads/Asphalt |
| Bear Lake | Improvements | Sprinklers |

**Camperworld**
Fixed Asset Schedule
December 31, 2016

| Location | Type | Asset Description |
|---|---|---|
| Bear Lake | Improvements | Trees |
| Bear Lake | Improvements | Roads-Improvements |
| Hot Springs | Improvements | Orig. Elect Hookups |
| Hot Springs | Improvements | Orig. Water System |
| Hot Springs | Improvements | Sidewalks/steps |
| Hot Springs | Improvements | Roads/Asphalt |
| Hot Springs | Improvements | Hookups |
| Hot Springs | Improvements | Landscape |
| Hot Springs | Improvements | Scuba Pond |
| Hot Springs | Improvements | Scuba Pond |
| Hot Springs | Improvements | Sprinkler/Irrigation |
| Hot Springs | Improvements | Well referbish |
| Knotty Pine | Improvements | Original Purchase |
| Knotty Pine | Improvements | Pads & |
| Knotty Pine | Improvements | Pads & Hookups & |
| Knotty Pine | Improvements | Electrical Hoopups |
| Knotty Pine | Improvements | Sprinklers |
| Knotty Pine | Improvements | Pads |
| Knotty Pine | Improvements | Water System |
| Knotty Pine | Improvements | Sprinklers |
| Knotty Pine | Improvements | Trees |
| Knotty Pine | Improvements | Roads/Asphalt |
| Knotty Pine | Improvements | Well |
| Knotty Pine | Improvements | Basketball Court |
| Knotty Pine | Improvements | Electrical Upgrade |
| Knotty Pine | Improvements | Turf |
| Knotty Pine | Improvements | Landscape |
| Knotty Pine | Improvements | Hookups |
| Knotty Pine | Improvements | Water System |
| Lakeside | Improvements | Pads |
| Lakeside | Improvements | Well |
| Lakeside | Improvements | Sprinkler System |
| Lakeside | Improvements | Electrical Hookups |
| Lakeside | Improvements | Septic Tank |
| Lakeside | Improvements | 10 Cottonwood Trees |
| Lakeside | Improvements | Trees |
| Lakeside | Improvements | Sewer Hookups |
| Lakeside | Improvements | Roads/Asphalt |
| Lakeside | Improvements | Landscape |
| Pleasant Creek | Improvements | Original Purchase |
| Pleasant Creek | Improvements | Roads/pads/hookups |
| Pleasant Creek | Improvements | Sewer |
| Pleasant Creek | Improvements | Landscaping |
| Pleasant Creek | Improvements | Tennis Courts |
| Pleasant Creek | Improvements | Water Well (4/92) |
| Pleasant Creek | Improvements | Swimming Pool |
| Pleasant Creek | Improvements | Trees |
| Pleasant Creek | Improvements | Sprinkler Sys |
| Pleasant Creek | Improvements | Pads & Hookups |
| Pleasant Creek | Improvements | Trees |
| Pleasant Creek | Improvements | Electric Upgrade |
| Pleasant Creek | Improvements | Hook-ups |
| Pleasant Creek | Improvements | Hookups |
| Pleasant Creek | Improvements | Hookups, etc |
| Echo | Improvements | Well |
| Echo | Improvements | Irrigation System |
| Echo | Improvements | Sewer System |
| Echo | Improvements | Bridges |
| Echo | Improvements | Electric Hookups |
| Echo | Improvements | Electric Hookups |

**Camperworld**
Fixed Asset Schedule
December 31, 2016

| Location | Type | Asset Description |
|---|---|---|
| Echo | Improvements | Sewer System |
| Echo | Improvements | Sewer System |
| Echo | Improvements | Sprinkler |
| Echo | Improvements | Fence |
| Echo | Improvements | Pool |
| Echo | Improvements | Electric Hookups |
| Echo | Improvements | Bridges/Decking |
| Echo | Improvements | Sidewalks |
| Echo | Improvements | Landscape |
| Echo | Improvements | Sprinklers |
| Echo | Improvements | Trees |
| Echo | Improvements | Electric Hookups |
| Echo | Improvements | Sprinkler System |
| Echo | Improvements | Electric Hookups |
| Echo | Improvements | Sprinlers |
| Echo | Improvements | Trees  7-89 |
| Echo | Improvements | Trees  8-90 |
| Echo | Improvements | Road Asphalt |
| Echo | Improvements | Trees |
| Echo | Improvements | Waterline |
| Echo | Improvements | Electric Hookups |
| Echo | Improvements | River/riprap |
| Echo | Improvements | Trees |
| Echo | Improvements | Powerline |
| Echo | Improvements | Foot Bridge |
| Echo | Improvements | Road Asphalt |
| Echo | Improvements | Electric Hookups |
| Echo | Improvements | Pond Landscape&Dredge |
| Echo | Improvements | River Bridge |
| Echo | Improvements | Road/Rotomil/Asphalt |
| Echo | Improvements | Pond Improvements |
| Echo | Improvements | Landscape |
| Echo | Improvements | Campsites |
| Echo | Improvements | Electric Hookups |
| Echo | Improvements | Hookup upgrade/power |
| Echo | Improvements | Bridge |
| Echo | Improvements | New Gas Line |
| Echo | Improvements | Natural Gas System |
| Echo | Improvements | Turf |
| Echo | Improvements | Landscape |
| Echo | Improvements | Hookups/sites |

*Improvements*

*__Land__*

| | | |
|---|---|---|
| Bear Lake | Land | Original Purchase |
| Bear Lake | Land | Purchase |
| Echo | Land | Original Purchase |
| Echo | Land | Original Purchase |
| Echo | Land | Original Purchase |
| Echo | Land improvements | Original Purchase |
| Hot Springs | Land | Original Purchase |
| Knotty Pine | Land | Original Purchase |
| Knotty Pine | Land | Purchase |
| Lakeside | Land | Original Purchase |
| Pleasant Creek | Land | Original Purchase |
| General | Improvements | General Parks Improvements |

**Camperworld**
Fixed Asset Schedule
December 31, 2016

| | Location | Type | Asset Description |
|---|---|---|---|
| *Land* | | | |
| | | | |
| ***Land Improvements*** | | | |
| | Bear Lake | Land improvements | Land Improvements |
| | Bear Lake | Land improvements | Landscape & Roads |
| | Echo | Land improvements | Land Improvements |
| | Echo | Land improvements | Land Improvements |
| | Echo | Land improvements | Land Improvements |
| | Echo | Land improvements | Land Improvements |
| | Echo | Land improvements | Land Improvements |
| | Knotty Pine | Land improvements | Land Improvements |
| | Knotty Pine | Land improvements | Land Improvements |
| | Knotty Pine | Land improvements | Land Improvements |
| | Lakeside | Land improvements | Improvements |
| | Pleasant Creek | Land Improvements | Land Improvements |
| | Pleasant Creek | Land Improvements | Land Improvements |
| | | | |
| *Land Improvements* | | | |
| | | | |
| *Total* | | | |

**Camperworld**
Fixed Asset Schedule
**December 31, 2016**

| Location | Type | Asset Description |
|----------|------|-------------------|

# Founding Member Cabin Membership Contract

Membership #:_____ Type: _____ Date:_____

Primary Member Name: _____

Driver's License #/State:_____ Email:_____

Date of Birth:_____Mobile Phone:_____Home Phone: _____

Member(s)' Street Address: _____

City:_____State:_____Zip: _____

Secondary Member Name: _____

Driver's License #/State:_____ Email:_____

Date of Birth:_____ Mobile Phone:_____ Other Phone: _____

DEFINITIONS:

**Good Standing:** Retrailia RV Resorts Member that have paid all required fees. Fees include, but are not limited to: dues, late fees, interest, principle payments, and financing fees.

**Founding Member:** Any Retrailia RV Resorts Member that is in Good Standing at the transfer of business title to *"New Entity Name"*.

THE UNDERSIGNED, a Founding Member and *"New Entity Name"* hereby agree as follows:

1  *"New Entity Name"* **Cabin Membership:** Founding Member hereby receives and *"New Entity Name"* hereby awards to Founding Member a Cabin Membership ("Membership"). The Membership under this Cabin Membership Contract ("Contract") shall entitle Founding Member during his/her lifetime to one (1) or two (2) weeks of cabin use at certain recreational campgrounds ("Campgrounds") operated by, or made available through, *"New Entity Name"* as specified in Section 2 of this Contract.

2  **Campground Designation:** Founding Member understands and agrees the Membership received under this Contract entitles Founding Member to recreational use of the *"New Entity Name"* Campgrounds at which the cabin(s) may be located. Other recreational use may be available at any other Retrailia campground. Campgrounds with cabins include the following:

| | 1 – Bedroom | 2 – Bedroom | 2 – Bedroom Deluxe |
|---|---|---|---|
| Echo Island Ranch | x | x | |
| Knotty Pine Resort | x | | |
| Pleasant Creek Ranch | | | x |

3. **Annual Dues:** Founding Member agrees to pay Annual Dues during the term of this Contract. The current Annual Dues are frozen through 2019. The Current Annual Dues are as follows:

| | Cabin Membership Only | If Member also has an RV Membership |
|---|---|---|
| 1-Bedroom Cabin / 1 Week | $299 | $199 |
| 1-Bedroom Cabin / 2 Weeks | $399 | $299 |
| 2-Bedroom Cabin / 1 Week | $350 | $250 |
| 2-Bedroom Cabin / 2 Weeks | $450 | $350 |

Starting in 2020 the amount of Annual Dues may vary from year to year. Founding Member dues will not increase by more than 5% per year. Founding Member agrees to submit payment of Annual Dues by the 1st day of the camping year (i.e., on or before October 1st of each year). Founding Member paid in full Annual Dues to Camperworld, Inc. d/b/a Retrailia RV Resorts ("Retrailia") for the camping year running from October 1, 2016 through September 30, 2017. *"New Entity Name"* has credited the dues paid to Retrailia for the same period under this Contract.

4. **One-Time Processing Fee:** Founding Member agrees to pay to *"New Entity Name"* a one-time processing fee in the amount of $99.00.

5. **Usage Fees:** Founding Member shall not be required to pay a Daily Usage Fee for use of the cabin for the specified one- or two-week period. Founding Member shall be entitled to use the cabin beyond the specified one- or two-week period, on an as-available basis for a discounted Daily Usage Fee equal to 50% of the posted Daily Usage Fee.

6. **Assessments:** Founding Member agrees to pay duly authorized assessments within thirty (30) days of notice from "New Entity Name". Assessments will not exceed $300 in total for any given year. Assessments cannot be levied more frequently than every three (3) years. If a Member is unwilling or unable to pay a duly authorized assessment, the *"New Entity Name"* may terminate the Membership and all related rights.

7. **No Other Financial Commitments:** Founding members shall have no payment obligations or financial commitments to *"New Entity Name"* as a condition of Membership or use of the Campgrounds in paragraph 2, above, except for the financial obligations expressly described or referenced in this Contract and its attachments, including specified except the Annual Dues (as described in paragraph 3), the one-time processing fee (as described in paragraph 4), usage fees (as described in paragraph 5), assessments (as described in paragraph 6), and other charges as described in the Pricing List attached hereto as **Schedule 1**.

8. **Founding Member Membership Privileges:**

   a. A Founding Member may have at least two open reservations on the books at one time.

   b. A Founding Member receives a 50% discount on all cabin rentals.

   c. A Founding Member receives a 35% discount for all RV spaces.

   d. Founding Membership benefits, use rights, and/or privileges granted under this Contract are available only to the individual(s) signing this contract.

   e. Group reservations are available at some *"New Entity Name"* Campgrounds upon request through *"New Entity Name"* corporate office for a fee, dependent upon availability.

   f.   RV storage is available at some *"New Entity Name"* campgrounds for a fee, dependent upon availability. A separate contract must be executed to utilize storage sites.

9. **RPI, Coast to Coast and AOR Affiliations:** *"New Entity Name"* has affiliations with Resort Parks International, Coast to Coast and Adventure Outdoor Resorts ("Affiliates"), which provide for discounts to *"New Entity Name"* Members. Access to those discounts requires that you own memberships in the Affiliates. All Founding Members own a membership in these affiliates by paying the initial sign-up fee and annual dues only. No additional upgrade fee or purchase price will be required. Participating affiliates may be modified (added to or deleted) at any time.

10. **Rules and Regulations:** Member acknowledges receipt of   current Member Policy Guide. Member agrees to abide by all rules and regulations in their present form, and as they may be amended from time to time by *"New Entity Name"*, without prior notice. Up to date rules and regulations may be obtained at *"New Entity Name's"* website or at the Campgrounds at the time of check-in. Failure to adhere to rules and regulations may result in eviction from the Campgrounds, fines and/or suspensions of rights under this Contract.

11. **Acknowledgments / Representations:**

   a.   Member acknowledges receipt of *"New Entity Name"* Utah Property Report.

   b.   Founding Member has examined maps and other documents describing the recreational properties owned by, or made available through, *"New Entity Name"* for use of its Founding Members and is fully satisfied as to all matters which are material to Founding Member with respect to the location, topography, and all pertinent physical characteristics of the properties.

   c.   Zions Gate RV Resort is an HOA campground that *"New Entity Name"* owns campsites in. Founding Member understands and agrees to abide by Zions Gate RV Resort's rules and regulations.

   d.   Founding Member understands that Membership is for recreational use and enjoyment of Founding Member and is not designed for financial investment.

FOUNDING MEMBER ACKNOWLEDGES THAT THE ACKNOWLEDGMENTS AND REPRESENTATIONS SET FORTH ABOVE OR ELSEWHERE IN THIS CONTRACT ARE TRUE AND ARE THOSE OF THE UNDERSIGNED INDIVIDUAL(S). FOUNDING MEMBER SHOULD NOT PURCHASE A MEMBERSHIP IF ANY SUCH ACKNOWLEDGMENTS OR REPRESENTATIONS ARE UNTRUE.

12. **Term and Transferability:** The term of the Membership and the associated membership benefits are limited to the lifetime of the Founding Member(s); however, the Founding Member(s) may terminate their Membership at any time with a 30-day written notice to *"New Entity Name"*. After such notice the Founding Member(s) shall have no further rights under this Contract and Founding Member(s) shall not be entitled to a refund of any amount paid prior to termination. The 30-day written notice will not terminate any financing contracts that were executed for the purchase price of the Membership.

The Membership may be bequeathed to an heir for a $99.00 transfer fee.  Membership may not be publicly advertised for sale, transfer, trade or conveyance (ie: KSL.com, listing in a paper, etc.) Founding Member(s) must contact *"New Entity Name"* corporate office, in writing, for authorization to transfer, assign, or convey Membership.. Upon approval, an applicable processing fee will apply. *"New Entity Name"* retains the first right of refusal to purchase Founding Member Membership.

13. **No Oral Representations:** This Contract supersedes all representations, understandings and agreements, and constitutes the entire agreement between the parties, there having been no oral or implied representations, statements, agreements or understandings, which are or shall be considered in any event to be a part thereof, or

as having been any inducement to signing this Contract.

14. **Late Fees:** If a payment of any fees, dues or other obligation described herein is late by ten (10) days or more, Founding Member will be charged ten percent (10%) of the amount past due for each month the payment is late.

15. **Default:** In the event Founding Member defaults in any payment of any fees, dues or obligations due hereunder, *"New Entity Name"* may terminate this Contract and the Membership, after which Founding Member shall have no further rights under this Contract and Founding Member shall not be entitled to a refund of any amount paid prior to termination.

16. **Choice of Law, Jurisdiction and Venue:** This Contract shall be interpreted under and is pursuant to the laws of the State of Utah. Member expressly agrees that the courts of Salt Lake County, State of Utah, shall have personal jurisdiction and venue in all suits and proceedings arising out of or relating in any way to this Contract.

YOU MAY CANCEL THIS CONTRACT WITHOUT ANY CANCELLATION FEE OR OTHER PENALTY BY HAND DELIVERING OR SENDING BY CERTIFIED MAIL, WRITTEN NOTICE OF CANCELLATION TO *"NEW ENTITY NAME"* CORPORATE OFFICE. THE NOTICE MUST BE DELIVERED OR POSTMARKED BY MIDNIGHT OF THE FIFTH (5TH) DAY FOLLOWING THE DAY ON WHICH THE CONTRACT IS SIGNED. IN COMPUTING THE NUMBER OF CALENDAR DAYS, THE DAY ON WHICH THE CONTRACT IS SIGNED AND LEGAL HOLIDAYS ARE NOT INCLUDED.

THIS IS A LEGAL AND BINDING CONTRACT

Date:_____   By: _____   _____
                            (Primary Founding Member Printed Name)      (Primary Founding Member Signature)

Date:_____   By: _____   _____
                            (Secondary Founding Member Printed Name)    (Secondary Founding Member Signature)

Date:_____   By: _____   _____
                            (*"New Entity Name"* Representative Printed Name)   (*"New Entity Name"* Representative Signature)

                       Its: _____
                            (*"New Entity Name"* Representative Printed Title)

# Founding Member Multi-Park Membership Contract
# (Limited Use)

Membership #: _____ Type:_____ Date: _____

Primary Member Name: _____

Driver's License #/State:_____Email:_____

Date of Birth:_____Mobile Phone:_____Home Phone: _____

Member(s)' Street Address: _____

City:_____State:_____Zip: _____


Secondary Member Name: _____

Driver's License #/State:_____ Email:_____

Date of Birth:_____ Mobile Phone:_____ Other Phone: _____


DEFINITIONS:

**Good Standing:**  Retrailia RV Resorts Member that have paid all required fees.  Fees include, but are not limited to:  dues, late fees, interest, principle payments, and financing fees.

**Founding Member:**  Any Retrailia RV Resorts Member that is in Good Standing at the transfer of business title to *"New Entity Name"*.


THE UNDERSIGNED, a Founding Member and *"New Entity Name"* hereby agree as follows:


1   *"New Entity Name"* **Multi-Park Membership:** Founding Member hereby receives and *"New Entity Name"* hereby awards to Founding Member a Multi-Park Membership ("Membership"). The Membership under this Multi-Park Membership Contract ("Contract") shall entitle Founding Member during his/her lifetime to the right to use certain recreational campgrounds ("Campgrounds") operated by, or made available through, *"New Entity Name"* as specified in Section 3 of this Contract.

2   **Camping Nights Available:** This Multi-Park Limited Contract has three options for Founding Members.  Please choose one below:

☐  10-Night
☐  20-Night
☐  30-Night

3. **Campground Designation:** Founding Member understands and agrees the Membership received under this Contract entitles Founding Member to recreational use of the *"New Entity Name"* Campgrounds.

The Campgrounds acquired and retained, and the improvements upon each, will vary as *"New Entity Name"* may determine from time to time and are subject to park availability, and the use and availability of a particular Campground is subject to the right of *"New Entity Name"* to buy, sell, or close Campgrounds. The Campgrounds currently available to Multi Park Founding Members are:

| | | |
|---|---|---|
| Echo Island Ranch | Lakeside Park | Zions Gate RV Resort |
| Knotty Pine Resort | Pleasant Creek Ranch | |

4. **Annual Dues:** Founding Member agrees to pay Annual Dues during the term of this Contract. The current Annual Dues are: 10-Night $299 per year, 20-Night $399 per year, and 30-Night $499 per year through 2019. Starting in 2020 the amount of Annual Dues may vary from year to year. Founding Member dues will not increase by more than 5% per year. Founding Member agrees to submit payment of Annual Dues by the 1st day of the camping year (i.e., on or before October 1st of each year). Founding Member paid in full Annual Dues to Camperworld, Inc. d/b/a Retrailia RV Resorts ("Retrailia") for the camping year running from October 1, 2016 through September 30, 2017. *"New Entity Name"* has credited the dues paid to Retrailia for the same period under this Contract.

5. **Usage Fees:** Founding Members shall be required to pay a Daily Usage Fee once they have exceeded their contracted number of nights during a year.

6. **One-Time Processing Fee:** Founding Member agrees to pay to *"New Entity Name"* a one-time processing fee in the amount of $99.00.

7. **Assessments:** Founding Member agrees to pay duly authorized assessments within thirty (30) days of notice from "New Entity Name". Assessments will not exceed $300 in total for any given year. Assessments cannot be levied more frequently than every three (3) years. If a Member is unwilling or unable to pay a duly authorized assessment, the *"New Entity Name"* may terminate the Membership and all related rights.

8. **No Other Financial Commitments:** Founding members shall have no payment obligations or financial commitments to *"New Entity Name"* as a condition of Membership or use of the Campgrounds in paragraph 3, above, except for the financial obligations expressly described or referenced in this Contract and its attachments, including specified except the Annual Dues (as described in paragraph 4), usage fees (as described in paragraph 5), the one-time processing fee (as described in paragraph 6), assessments (as described in paragraph 7), and other charges as described in the Pricing List attached hereto as **Schedule 1**.

9. **Founding Member Membership Privileges:**

    a. A Founding Member may camp for up to 14 consecutive nights in an individual Campground, then they must leave that specific Campground for 7-nights before returning.

    b. A Founding Member may have one open reservation on the books at one time.

    c. A Founding Member receives a 50% discount on all cabin rentals.

    d. A Founding Member receives a 35% discount for nights camped that exceed their contracted amount.

    e. Founding Membership benefits, use rights, and/or privileges granted under this Contract are available only to the individual(s) signing this contract.

    f. Group reservations are available at some *"New Entity Name"* Campgrounds upon request through *"New*

*Entity Name"* corporate office for a fee, dependent upon availability.

    g.  RV storage is available at some *"New Entity Name"* campgrounds for a fee, dependent upon availability. A separate contract must be executed to utilize storage sites.

**10. RPI, Coast to Coast and AOR Affiliations:** *"New Entity Name"* has affiliations with Resort Parks International, Coast to Coast and Adventure Outdoor Resorts ("Affiliates"), which provide for discounts to *"New Entity Name"* Members. Access to those discounts requires that you own memberships in the Affiliates. Limited Founding Members are required to purchase this access from the *"New Entity Name"* at the current price for the upgrade. Participating affiliate may be modified (added to or deleted) at any time.

**11. Rules and Regulations:** Member acknowledges receipt of  current Member Policy Guide. Member agrees to abide by all rules and regulations in their present form, and as they may be amended from time to time by" New without prior notice. Up to date rules and regulations may be obtained at *"New Entity Name"* website or at the Campgrounds at the time of check-in. Failure to adhere to rules and regulations may result in eviction from the Campgrounds, fines and/or suspensions of rights under this Contract.

**12. Acknowledgments / Representations:**

    a.  Member acknowledges receipt of *"New Entity Name"* Utah Property Report.

    b.  Founding Member has examined maps and other documents describing the recreational properties owned by, or made available through, *"New Entity Name"* for use of its Founding Members and is fully satisfied as to all matters which are material to Founding Member with respect to the location, topography, and all pertinent physical characteristics of the properties.

    c.  Zions Gate RV Resort is an HOA campground that *"New Entity Name"* owns campsites in. Founding Member understands and agrees to abide by Zions Gate RV Resort's rules and regulations.

    d.  Founding Member understands that Membership is for recreational use and enjoyment of Founding Member and is not designed for financial investment.

FOUNDING MEMBER ACKNOWLEDGES THAT THE ACKNOWLEDGMENTS AND REPRESENTATIONS SET FORTH ABOVE OR ELSEWHERE IN THIS CONTRACT ARE TRUE AND ARE THOSE OF THE UNDERSIGNED INDIVIDUAL(S). FOUNDING MEMBER SHOULD NOT PURCHASE A MEMBERSHIP IF ANY SUCH ACKNOWLEDGMENTS OR REPRESENTATIONS ARE UNTRUE.

**13. Term and Transferability:** The term of the Membership and the associated membership benefits are limited to the lifetime of the Founding Member(s); however, the Founding Member(s) may terminate their Membership at any time with a 30-day written notice to *"New Entity Name"*. After such notice the Founding Member(s) shall have no further rights under this Contract and Founding Member(s) shall not be entitled to a refund of any amount paid prior to termination. The 30-day written notice will not terminate any financing contracts that were executed for the purchase price of the Membership.

The Limited Multi-Park Membership is not transferrable.

**14. No Oral Representations:** This Contract supersedes all representations, understandings and agreements, and constitutes the entire agreement between the parties, there having been no oral or implied representations, statements, agreements or understandings, which are or shall be considered in any event to be a part thereof, or as having been any inducement to signing this Contract.

**16. Late Fees:** If a payment of any fees, dues or other obligation described herein is late by ten (10) days or more, Founding Member will be charged ten percent (10%) of the amount past due for each month the payment is late.

17. **Default:** In the event Founding Member defaults in any payment of any fees, dues or obligations due hereunder, *"New Entity Name"* may terminate this Contract and the Membership, after which Founding Member shall have no further rights under this Contract and Founding Member shall not be entitled to a refund of any amount paid prior to termination.

18. **Choice of Law, Jurisdiction and Venue:** This Contract shall be interpreted under and is pursuant to the laws of the State of Utah. Member expressly agrees that the courts of Salt Lake County, State of Utah, shall have personal jurisdiction and venue in all suits and proceedings arising out of or relating in any way to this Contract.

YOU MAY CANCEL THIS CONTRACT WITHOUT ANY CANCELLATION FEE OR OTHER PENALTY BY HAND DELIVERING OR SENDING BY CERTIFIED MAIL, WRITTEN NOTICE OF CANCELLATION TO *"NEW ENTITY NAME"* CORPORATE OFFICE. THE NOTICE MUST BE DELIVERED OR POSTMARKED BY MIDNIGHT OF THE FIFTH (5TH) DAY FOLLOWING THE DAY ON WHICH THE CONTRACT IS SIGNED. IN COMPUTING THE NUMBER OF CALENDAR DAYS, THE DAY ON WHICH THE CONTRACT IS SIGNED AND LEGAL HOLIDAYS ARE NOT INCLUDED.

THIS IS A LEGAL AND BINDING CONTRACT

Date:_____  By: _____  _____
                          (Primary Founding Member Printed Name)    (Primary Founding Member Signature)

Date:_____  By: _____  _____
                          (Secondary Founding Member Printed Name)   (Secondary Founding Member Signature)

Date:_____  By: _____  _____
                          (*"New Entity Name"* Representative Printed Name)   (*"New Entity Name"* Representative Signature)

                      Its: _____
                          (*"New Entity Name"* Representative Printed Title)

# Founding Member Multi-Park Membership Contract
# (Unlimited Use)

Membership #:_____   Type: _____   Date:_____

Primary Member Name:  _____

Driver's License #/State:_____Email:_____

Date of Birth:_____Mobile Phone:_____Home Phone: _____

Member(s)' Street Address: _____

City:_____State:_____Zip: _____


Secondary Member Name:  _____

Driver's License #/State:_____   Email:_____

Date of Birth:_____   Mobile Phone:_____   Other Phone: _____

## DEFINITIONS:

**Good Standing:**  Retrailia RV Resorts Member that have paid all required fees.  Fees include, but are not limited to:  dues, late fees, interest, principle payments, and financing fees.

**Founding Member:**  Any Retrailia RV Resorts Member that is in Good Standing at the transfer of business title to *"New Entity Name"*.


THE UNDERSIGNED, a Founding Member and *"New Entity Name"* hereby agree as follows:


1   *"New Entity Name"* **Multi-Park Membership:** Founding Member hereby receives and *"New Entity Name"* hereby awards to Founding Member a Multi-Park Membership ("Membership"). The Membership under this Multi-Park Membership Contract ("Contract") shall entitle Founding Member during his/her lifetime to the right to use certain recreational campgrounds ("Campgrounds") operated by, or made available through, *"New Entity Name"* as specified in Section 2 of this Contract.

2   **Campground Designation:** Founding Member understands and agrees the Membership received under this Contract entitles Founding Member to recreational use of the *"New Entity Name"* Campgrounds.

The Campgrounds acquired and retained, and the improvements upon each, will vary as *"New Entity Name"* may determine from time to time and are subject to park availability, and the use and availability of a particular Campground is subject to the right of *"New Entity Name"* to buy, sell, or close Campgrounds. The Campgrounds currently available to Multi Park Founding Members are:

| | | |
|---|---|---|
| Echo Island Ranch | Lakeside Park | Zions Gate RV Resort |
| Knotty Pine Resort | Pleasant Creek Ranch | |

3. **Annual Dues:** Founding Member agrees to pay Annual Dues during the term of this Contract. The current Annual Dues are: $499 per year through 2019. Starting in 2020 the amount of Annual Dues may vary from year to year. Founding Member dues will not increase by more than 5% per year. Founding Member agrees to submit payment of Annual Dues by the 1ˢᵗ day of the camping year (i.e., on or before October 1ˢᵗ of each year). Founding Member paid in full Annual Dues to Camperworld, Inc. d/b/a Retrailia RV Resorts ("Retrailia")for the camping year running from October 1, 2016 through September 30, 2017. *"New Entity Name"* has credited the dues paid to Retrailia for the same period under this Contract.

4. **One-Time Processing Fee:** Founding Member agrees to pay to *"New Entity Name"* a one-time processing fee in the amount of $99.00.

5. **Usage Fees:** Founding Members shall not be required to pay a Daily Usage Fee or any additional fees at the park while camping.

6. **Assessments:** Founding Member agrees to pay duly authorized assessments within thirty (30) days of notice from "New Entity Name". Assessments will not exceed $300 in total for any given year. Assessments cannot be levied more frequently than every three (3) years. If a Member is unwilling or unable to pay a duly authorized assessment, the *"New Entity Name"* may terminate the Membership and all related rights.

7. **No Other Financial Commitments:** Founding members shall have no payment obligations or financial commitments to *"New Entity Name"* as a condition of Membership or use of the Campgrounds in paragraph 2, above, except for the financial obligations expressly described or referenced in this Contract and its attachments, including specified except the Annual Dues (as described in paragraph 3), the one-time processing fee (as described in paragraph 4), assessments (as described in paragraph 6), and other charges as described in the Pricing List attached hereto as **Schedule 1**.

8. **Founding Member Membership Privileges:**

   a. A Founding Member has unlimited nights of camping per year available to them.

   b. A Founding Member may camp for up to 14 consecutive nights in an individual Campground, then they must leave that specific Campground for 7-nights before returning.

   c. A Founding Member may have at least three open reservations on the books at one time.

   d. A Founding Member receives a 50% discount on all cabin rentals.

   e. A Founding Member receives a 35% discount for all extra spaces.

   f. A Founding Member automatically has new Campgrounds acquired by *"New Entity Name"* added to their Founding Member Membership Contract with no upgrade fee.

   g. Founding Membership benefits, use rights, and/or privileges granted under this Contract are available only to the individual(s) signing this contract.

   h. Group reservations are available at some *"New Entity Name"* Campgrounds upon request through *"New Entity Name"* corporate office for a fee, dependent upon availability.

   i. RV storage is available at some *"New Entity Name"* campgrounds for a fee, dependent upon availability. A separate contract must be executed to utilize storage sites.

9. **RPI, Coast to Coast and AOR Affiliations:** *"New Entity Name"* has affiliations with Resort Parks International, Coast to Coast and Adventure Outdoor Resorts ("Affiliates"), which provide for discounts to *"New Entity Name"* Members. Access to those discounts requires that you own memberships in the Affiliates. All Founding Members own a membership in these affiliates by paying the initial sign-up fee and annual dues only. No additional upgrade fee or purchase price will be required. Participating affiliates may be modified (added to

or deleted) at any time.

10. **Rules and Regulations:** Member acknowledges receipt of current Member Policy Guide. Member agrees to abide by all rules and regulations in their present form, and as they may be amended from time to time by *"New Entity Name"*, without prior notice. Up to date rules and regulations may be obtained at *"New Entity Name's"* website or at the Campgrounds at the time of check-in. Failure to adhere to rules and regulations may result in eviction from the Campgrounds, fines and/or suspensions of rights under this Contract.

11. **Acknowledgments / Representations:**

    a. Member acknowledges receipt of *"New Entity Name"* Utah Property Report.

    b. Founding Member has examined maps and other documents describing the recreational properties owned by, or made available through, *"New Entity Name"* for use of its Founding Members and is fully satisfied as to all matters which are material to Founding Member with respect to the location, topography, and all pertinent physical characteristics of the properties.

    c. Zions Gate RV Resort is an HOA campground that *"New Entity Name"* owns campsites in. Founding Member understands and agrees to abide by Zions Gate RV Resort's rules and regulations.

    d. Founding Member understands that Membership is for recreational use and enjoyment of Founding Member and is not designed for financial investment.

FOUNDING MEMBER ACKNOWLEDGES THAT THE ACKNOWLEDGMENTS AND REPRESENTATIONS SET FORTH ABOVE OR ELSEWHERE IN THIS CONTRACT ARE TRUE AND ARE THOSE OF THE UNDERSIGNED INDIVIDUAL(S). FOUNDING MEMBER SHOULD NOT PURCHASE A MEMBERSHIP IF ANY SUCH ACKNOWLEDGMENTS OR REPRESENTATIONS ARE UNTRUE.

12. **Term and Transferability:** The term of the Membership and the associated membership benefits are limited to the lifetime of the Founding Member(s); however, the Founding Member(s) may terminate their Membership at any time with a 30-day written notice to *"New Entity Name"*. After such notice the Founding Member(s) shall have no further rights under this Contract and Founding Member(s) shall not be entitled to a refund of any amount paid prior to termination. The 30-day written notice will not terminate any financing contracts that were executed for the purchase price of the Membership.

The Membership may be bequeathed to an heir for a $99.00 transfer fee.  Membership may not be publicly advertised for sale, transfer, trade or conveyance (ie: KSL.com, listing in a paper, etc.) Founding Member(s) must contact *"New Entity Name"* corporate office, in writing, for authorization to transfer, assign, or convey Membership.. Upon approval, an applicable processing fee will apply. *"New Entity Name"* retains the first right of refusal to purchase Founding Member Membership.

13. **No Oral Representations:** This Contract supersedes all representations, understandings and agreements, and constitutes the entire agreement between the parties, there having been no oral or implied representations, statements, agreements or understandings, which are or shall be considered in any event to be a part thereof, or as having been any inducement to signing this Contract.

14. **Late Fees:** If a payment of any fees, dues or other obligation described herein is late by ten (10) days or more, Founding Member will be charged ten percent (10%) of the amount past due for each month the payment is late.

15. **Default:** In the event Founding Member defaults in any payment of any fees, dues or obligations due hereunder, *"New Entity Name"* may terminate this Contract and the Membership, after which Founding Member shall have no further rights under this Contract and Founding Member shall not be entitled to a refund of any amount paid prior to termination.

**16. Choice of Law, Jurisdiction and Venue:** This Contract shall be interpreted under and is pursuant to the laws of the State of Utah. Member expressly agrees that the courts of Salt Lake County, State of Utah, shall have personal jurisdiction and venue in all suits and proceedings arising out of or relating in any way to this Contract.

YOU MAY CANCEL THIS CONTRACT WITHOUT ANY CANCELLATION FEE OR OTHER PENALTY BY HAND DELIVERING OR SENDING BY CERTIFIED MAIL, WRITTEN NOTICE OF CANCELLATION TO *"NEW ENTITY NAME"* CORPORATE OFFICE. THE NOTICE MUST BE DELIVERED OR POSTMARKED BY MIDNIGHT OF THE FIFTH (5TH) DAY FOLLOWING THE DAY ON WHICH THE CONTRACT IS SIGNED. IN COMPUTING THE NUMBER OF CALENDAR DAYS, THE DAY ON WHICH THE CONTRACT IS SIGNED AND LEGAL HOLIDAYS ARE NOT INCLUDED.

THIS IS A LEGAL AND BINDING CONTRACT

Date:_____    By: _____    _____
                                    (Primary Founding Member Printed Name)         (Primary Founding Member Signature)

Date:_____    By: _____    _____
                                    (Secondary Founding Member Printed Name)       (Secondary Founding Member Signature)

Date:_____    By: _____    _____
                                    (*"New Entity Name"* Representative Printed Name)   (*"New Entity Name"* Representative Signature)

                          Its: _____
                                    (*"New Entity Name"* Representative Printed Title)

# Founding Member Single Park Membership Contract

Membership #: _____ Type:_____ Date: _____

Primary Member Name: _____

Driver's License #/State:_____ Email:_____

Date of Birth:_____ Mobile Phone:_____ Home Phone: _____

Member(s)' Street Address: _____

City:_____State:_____Zip: _____

Secondary Member Name: _____

Driver's License #/State:_____ Email:_____

Date of Birth:_____ Mobile Phone:_____ Other Phone: _____

DEFINITIONS:

   **Good Standing**:  Retrailia RV Resorts Member that have paid all required fees.  Fees include, but are not limited to:  dues, late fees, interest, principle payments, and financing fees.

   **Founding Member**:  Any Retrailia RV Resorts Member that is in Good Standing at the transfer of business title to *"New Entity Name"*.

THE UNDERSIGNED, a Founding Member and *"New Entity Name"* hereby agree as follows:

1   *"New Entity Name"* **Single-Park Membership**: Founding Member hereby receives and *"New Entity Name"* hereby awards to Founding Member a Single-Park Membership ("Membership"). The Membership under this Single-Park Membership Contract ("Contract") shall entitle Founding Member during his/her lifetime to the right to use one recreational campground ("Campground") operated by, or made available through, *"New Entity Name"* as specified in Section 3 of this Contract.

2   **Camping Nights Available:**  This Single-Park Limited Contract has three options for Founding Members. Please choose one below:
   ☐ $199 dues and pay daily rate for camping.
   ☐ $299 dues and unlimited Single Park Camping

3   **Campground Designation:** Founding Member understands and agrees the Membership received under this Contract entitles Founding Member to recreational use at one of the *"New Entity Name"* Campgrounds.

The Campgrounds acquired and retained, and the improvements upon each, will vary as *"New Entity Name"* may determine from time to time and are subject to park availability, and the use and availability of a particular Campground is subject to the right of *"New Entity Name"* to buy, sell, or close Campgrounds. The Campgrounds currently available to Single Park Founding Members are:

Lakeside Park or Pleasant Creek Ranch when dues are paid, member home park is _____.

4. **Annual Dues:** Founding Member agrees to pay Annual Dues during the term of this Contract. The current Annual Dues are: $99 per year with no camping and $299 per year with unlimited camping per year through 2019. Starting in 2020 the amount of Annual Dues may vary from year to year. Founding Member dues will not increase by more than 5% per year. Founding Member agrees to submit payment of Annual Dues by the 1st day of the camping year (i.e., on or before October 1st of each year). Founding Member paid in full Annual Dues to Camperworld, Inc. d/b/a Retrailia RV Resorts ("Retrailia")for the camping year running from October 1, 2016 through September 30, 2017. *"New Entity Name"* has credited the dues paid to Retrailia for the same period under this Contract.

5. **Usage Fees:** Founding Members shall be required to pay a Daily Usage Fee once they have exceeded their contracted number of nights during a year.

6. **One-Time Processing Fee:** Founding Member agrees to pay to *"New Entity Name"* a one-time processing fee in the amount of $99.00.

7. **Assessments:** Founding Member agrees to pay duly authorized assessments within thirty (30) days of notice from "New Entity Name". Assessments will not exceed $300 in total for any given year. Assessments cannot be levied more frequently than every three (3) years. If a Member is unwilling or unable to pay a duly authorized assessment, the *"New Entity Name"* may terminate the Membership and all related rights.

8. **No Other Financial Commitments:** Founding members shall have no payment obligations or financial commitments to *"New Entity Name"* as a condition of Membership or use of the Campgrounds in paragraph 3, above, except for the financial obligations expressly described or referenced in this Contract and its attachments, including specified except the Annual Dues (as described in paragraph 4), usage fees (as described in paragraph 5), the one-time processing fee (as described in paragraph 6), assessments (as described in paragraph 7), and other charges as described in the Pricing List attached hereto as **Schedule 1**.

9. **Founding Member Membership Privileges:**

   a. A Founding Member has unlimited nights of camping per year available to them if paying $299 dues.

   b. A Founding Member may camp for up to 14 consecutive nights in an individual Campground, then they must leave that specific Campground for 7-nights before returning.

   c. A Founding Member may have one open reservation on the books at one time.

   d. A Founding Member receives a 50% discount on all cabin rentals.

   e. A Founding Member receives a 35% discount for nights camp that exceed their contracted amount or if paying $199 dues all of the nightly camp fees.

   f. Founding Membership benefits, use rights, and/or privileges granted under this Contract are available only to the individual(s) signing this contract.

   g. Group reservations are available at some *"New Entity Name"* Campgrounds upon request through *"New Entity Name"* corporate office for a fee, dependent upon availability.

   h. RV storage is available at some *"New Entity Name"* campgrounds for a fee, dependent upon availability. A separate contract must be executed to utilize storage sites.

10. **RPI, Coast to Coast and AOR Affiliations:** *"New Entity Name"* has affiliations with Resort Parks International, Coast to Coast and Adventure Outdoor Resorts ("Affiliates"), which provide for discounts to *"New Entity Name"* Members. Access to those discounts requires that you own memberships in the Affiliates. Limited Founding Members are required to purchase this access from the *"New Entity Name"* at the current price for the upgrade. Participating affiliates may be modified (added to or deleted) at any time.

11. **Rules and Regulations:** Member acknowledges receipt of current Member Policy Guide. Member agrees to abide by all rules and regulations in their present form, and as they may be amended from time to time by *"New*

*Entity Name"*, without prior notice. Up to date rules and regulations may be obtained at *"New Entity Name's"* website or at the Campgrounds at the time of check-in. Failure to adhere to rules and regulations may result in eviction from the Campgrounds, fines and/or suspensions of rights under this Contract.

**12. Acknowledgments / Representations:**

- Member acknowledges receipt of *"New Entity Name"* Utah Property Report.

- Founding Member has examined maps and other documents describing the recreational properties owned by, or made available through, *"New Entity Name"* for use of its Founding Members and is fully satisfied as to all matters which are material to Founding Member with respect to the location, topography, and all pertinent physical characteristics of the properties.

- Zions Gate RV Resort is an HOA campground that *"New Entity Name"* owns campsites in. Founding Member understands and agrees to abide by Zions Gate RV Resort's rules and regulations.

- Founding Member understands that Membership is for recreational use and enjoyment of Founding Member and is not designed for financial investment.

FOUNDING MEMBER ACKNOWLEDGES THAT THE ACKNOWLEDGMENTS AND REPRESENTATIONS SET FORTH ABOVE OR ELSEWHERE IN THIS CONTRACT ARE TRUE AND ARE THOSE OF THE UNDERSIGNED INDIVIDUAL(S). FOUNDING MEMBER SHOULD NOT PURCHASE A MEMBERSHIP IF ANY SUCH ACKNOWLEDGMENTS OR REPRESENTATIONS ARE UNTRUE.

**13. Term and Transferability:** The term of the Membership and the associated membership benefits are limited to the lifetime of the Founding Member(s); however, the Founding Member(s) may terminate their Membership at any time with a 30-day written notice to *"New Entity Name"*. After such notice the Founding Member(s) shall have no further rights under this Contract and Founding Member(s) shall not be entitled to a refund of any amount paid prior to termination. The 30-day written notice will not terminate any financing contracts that were executed for the purchase price of the Membership.

The Single-Park Membership is not transferrable.

**14. No Oral Representations:** This Contract supersedes all representations, understandings and agreements, and constitutes the entire agreement between the parties, there having been no oral or implied representations, statements, agreements or understandings, which are or shall be considered in any event to be a part thereof, or as having been any inducement to signing this Contract.

**15. Late Fees:** If a payment of any fees, dues or other obligation described herein is late by ten (10) days or more, Founding Member will be charged ten percent (10%) of the amount past due for each month the payment is late.

**16. Default:** In the event Founding Member defaults in any payment of any fees, dues or obligations due hereunder, *"New Entity Name"* may terminate this Contract and the Membership, after which Founding Member shall have no further rights under this Contract and Founding Member shall not be entitled to a refund of any amount paid prior to termination.

**17. Choice of Law, Jurisdiction and Venue:** This Contract shall be interpreted under and is pursuant to the laws of the State of Utah. Member expressly agrees that the courts of Salt Lake County, State of Utah, shall have personal jurisdiction and venue in all suits and proceedings arising out of or relating in any way to this Contract.

YOU MAY CANCEL THIS CONTRACT WITHOUT ANY CANCELLATION FEE OR OTHER PENALTY BY HAND DELIVERING OR SENDING BY CERTIFIED MAIL, WRITTEN NOTICE OF CANCELLATION TO *"NEW ENTITY NAME"* CORPORATE OFFICE. THE NOTICE MUST BE DELIVERED OR POSTMARKED BY MIDNIGHT OF THE FIFTH (5TH) DAY FOLLOWING THE DAY ON WHICH THE CONTRACT IS SIGNED. IN COMPUTING THE NUMBER OF CALENDAR DAYS, THE DAY ON WHICH THE CONTRACT IS SIGNED AND LEGAL HOLIDAYS ARE NOT INCLUDED.

THIS IS A LEGAL AND BINDING CONTRACT

Date:_____   By: _____   _____
                             (Primary Founding Member Printed Name)   (Primary Founding Member Signature)

Date:_____   By: _____   _____
                             (Secondary Founding Member Printed Name)   (Secondary Founding Member Signature)

Date:_____   By: _____   _____
                             (*"New Entity Name"* Representative Printed Name)   (*"New Entity Name"* Representative Signature)

                       Its: _____
                             (*"New Entity Name"* Representative Printed Title)

# Founding Member Trailblazer Membership Contract

Membership #:_____   Type: _____   Date:_____

Primary Member Name: _____

Driver's License #/State:_____   Email:_____

Date of Birth:_____Mobile Phone:_____Home Phone: _____

Member(s)' Street Address: _____

City:_____State:_____Zip: _____

Secondary Member Name: _____

Driver's License #/State:_____   Email:_____

Date of Birth:_____   Mobile Phone:_____   Other Phone: _____

DEFINITIONS:

**Good Standing:** Retrailia RV Resorts Member that have paid all required fees. Fees include, but are not limited to: dues, late fees, interest, principle payments, and financing fees.

**Founding Member:** Any Retrailia RV Resorts Member that is in Good Standing at the transfer of business title to *"New Entity Name"*.

THE UNDERSIGNED, a Founding Member and *"New Entity Name"* hereby agree as follows:

1  *"New Entity Name"* **Trailblazer Membership:** Founding Member hereby receives and *"New Entity Name"* hereby awards to Founding Member a Trailblazer Membership ("Membership"). The Membership under this Trailblazer Membership Contract ("Contract") shall entitle Founding Member during his/her lifetime to the right to use certain recreational campgrounds ("Campgrounds") operated by, or made available through, *"New Entity Name"* as specified in Section 2 of this Contract.

2  **Campground Designation:** Founding Member understands and agrees the Membership received under this Contract entitles Founding Member to recreational use of the *"New Entity Name"* Campgrounds.

The Campgrounds acquired and retained, and the improvements upon each, will vary as *"New Entity Name"* may determine from time to time and are subject to park availability, and the use and availability of a particular Campground is subject to the right of *"New Entity Name"* to buy, sell, or close Campgrounds. The Campgrounds currently available to Multi Park Founding Members are:

Echo Island Ranch                Lakeside Park                    Zions Gate RV Resort
Knotty Pine Resort               Pleasant Creek Ranch

**Page 1 of 4**

3. **Annual Dues:** Founding Member agrees to pay Annual Dues during the term of this Contract. The current Annual Dues are $99 per year. *"New Entity Name"* reserves the right to increase annual dues at any time.

4. **One-Time Processing Fee:** Founding Member agrees to pay to *"New Entity Name"* a one-time processing fee in the amount of $99.00.

5. **Usage Fees:** Founding Members shall be required to pay a Daily Usage Fee for use in the campgrounds.

6. **Assessments:** Trailblazer members shall not be required to pay assessments.

7. **No Other Financial Commitments:** Founding members shall have no payment obligations or financial commitments to *"New Entity Name"* as a condition of Membership or use of the Campgrounds in paragraph 2, above, except for the financial obligations expressly described or referenced in this Contract and its attachments, including specified except the Annual Dues (as described in paragraph 3), the one-time processing fee (as described in paragraph 4), usage fees (as described in paragraph 5), and other charges as described in the Pricing List attached hereto as **Schedule 1**.

8. **Founding Member Membership Privileges:**

   a. Founding Membership benefits, use rights, and/or privileges granted under this Contract are available only to the individual(s) signing this contract.

   b. Group reservations are available at some *"New Entity Name"* Campgrounds upon request through *"New Entity Name"* corporate office for a fee, dependent upon availability.

   c. RV storage is available at some *"New Entity Name"* campgrounds for a fee, dependent upon availability. A separate contract must be executed to utilize storage sites.

   d. Member is entitled to use other *"New Entity Name"* campgrounds, on an as-available basis, for a discounted Daily Usage Fee equal to 15% of the normal Daily Usage Fee for such campground. This discount percentage is subject to change on an annual basis.

9. **RPI, Coast to Coast and AOR Affiliations:** *"New Entity Name"* has affiliations with Resort Parks International, Coast to Coast and Adventure Outdoor Resorts ("Affiliates"), which provide for discounts to *"New Entity Name"* Members. Access to those discounts requires that you own memberships in the Affiliates. Trailblazer Founding Members are required to purchase this access from *"New Entity Name"* at the current price for the upgrade. Participating affiliates may be modified (added to or deleted) at any time.

10. **Rules and Regulations:** Member acknowledges receipt of current Member Policy Guide. Member agrees to abide by all rules and regulations in their present form, and as they may be amended from time to time by *"New Entity Name"*, without prior notice. Up to date rules and regulations may be obtained at *"New Entity Name's"* website or at the Campgrounds at the time of check-in. Failure to adhere to rules and regulations may result in eviction from the Campgrounds, fines and/or suspensions of rights under this Contract.

11. **Acknowledgments / Representations:**

    a. Member acknowledges receipt of *"New Entity Name"* Utah Property Report.

    b. Founding Member has examined maps and other documents describing the recreational properties owned by, or made available through, *"New Entity Name"* for use of its Founding Members and is fully satisfied as to all matters which are material to Founding Member with respect to the location, topography, and all pertinent physical characteristics of the properties.

    c. Zions Gate RV Resort is an HOA campground that *"New Entity Name"* owns campsites in. Founding Member understands and agrees to abide by Zions Gate RV Resort's rules and regulations.

    d. Founding Member understands that Membership is for recreational use and enjoyment of Founding Member

and is not designed for financial investment.

FOUNDING MEMBER ACKNOWLEDGES THAT THE ACKNOWLEDGMENTS AND REPRESENTATIONS SET FORTH ABOVE OR ELSEWHERE IN THIS CONTRACT ARE TRUE AND ARE THOSE OF THE UNDERSIGNED INDIVIDUAL(S). FOUNDING MEMBER SHOULD NOT PURCHASE A MEMBERSHIP IF ANY SUCH ACKNOWLEDGMENTS OR REPRESENTATIONS ARE UNTRUE.

12. **Term and Transferability:** The term of the Membership and the associated membership benefits are limited to the lifetime of the Founding Member(s); however, the Founding Member(s) may terminate their Membership at any time with a 30-day written notice to *"New Entity Name"*. After such notice the Founding Member(s) shall have no further rights under this Contract and Founding Member(s) shall not be entitled to a refund of any amount paid prior to termination. The 30-day written notice will not terminate any financing contracts that were executed for the purchase price of the Membership.

The Trailblazer Membership is not transferrable.

13. **No Oral Representations:** This Contract supersedes all representations, understandings and agreements, and constitutes the entire agreement between the parties, there having been no oral or implied representations, statements, agreements or understandings, which are or shall be considered in any event to be a part thereof, or as having been any inducement to signing this Contract.

14. **Late Fees:** If a payment of any fees, dues or other obligation described herein is late by ten (10) days or more, Founding Member will be charged ten percent (10%) of the amount past due for each month the payment is late.

15. **Default:** In the event Founding Member defaults in any payment of any fees, dues or obligations due hereunder, *"New Entity Name"* may terminate this Contract and the Membership, after which Founding Member shall have no further rights under this Contract and Founding Member shall not be entitled to a refund of any amount paid prior to termination.

16. **Choice of Law, Jurisdiction and Venue:** This Contract shall be interpreted under and is pursuant to the laws of the State of Utah. Member expressly agrees that the courts of Salt Lake County, State of Utah, shall have personal jurisdiction and venue in all suits and proceedings arising out of or relating in any way to this Contract.

YOU MAY CANCEL THIS CONTRACT WITHOUT ANY CANCELLATION FEE OR OTHER PENALTY BY HAND DELIVERING OR SENDING BY CERTIFIED MAIL, WRITTEN NOTICE OF CANCELLATION TO *"NEW ENTITY NAME"* CORPORATE OFFICE. THE NOTICE MUST BE DELIVERED OR POSTMARKED BY MIDNIGHT OF THE FIFTH (5TH) DAY FOLLOWING THE DAY ON WHICH THE CONTRACT IS SIGNED. IN COMPUTING THE NUMBER OF CALENDAR DAYS, THE DAY ON WHICH THE CONTRACT IS SIGNED AND LEGAL HOLIDAYS ARE NOT INCLUDED.

THIS IS A LEGAL AND BINDING CONTRACT

Date:_____   By: _____   _____
                                   (Primary Founding Member Printed Name)        (Primary Founding Member Signature)

Date:_____   By: _____   _____
                                   (Secondary Founding Member Printed Name)      (Secondary Founding Member Signature)

Date:_____   By: _____   _____
                                   (*"New Entity Name"* Representative Printed Name)   (*"New Entity Name"* Representative Signature)

                           Its: _____
                                   (*"New Entity Name"* Representative Printed Title)

ADDENDUM NUMBER 1

This ADDENDUM NUMBER 1 to the AGREEMENT FOR SALE OF LAND AND
ASSETS with contract reference date of May _23___, 2017 is made and entered
into as of _23_ day of May, 2017 by and between Camperworld, Inc. d/b/a
Retrailia RV Resorts, successor-in-interest to Camperworld Business Trust, a
Utah Business Trust, and Camperworld Utah, Inc. a Utah Corporation, as
SELLER and Souvall Management, Inc, or its permitted assign(s) as BUYER.
The following terms are hereby incorporated as part of the Agreement.

## ARTICLE III:  EARNEST MONEY DEPOSIT; PURCHASE PRICE

E.    *Operational/Repairs Account Funding.*  BUYER agrees to fund a joint bank
account in the amount of *Two Hundred Fifty Thousand Dollars* ($250,000) that
SELLER can use for any operational expense of the parks as well as necessary
repairs, upgrades, and other expenses to get the parks open.  This account will
be subject to the following:

1.  The $250,000 is contingent upon receiving funds from the permitted 3rd
    party investor.
2.  BUYER and SELLER will jointly sign all checks drawn on this account.
3.  SELLER will provide BUYER with requirements and back up bills for
    review prior to checks being signed.
4.  Funds will be drawn from this account only if there are insufficient funds in
    the SELLER's bank accounts to meet the necessary obligations.
5.  All funds drawn from this account will be considered sunk funds and non-
    refundable to the BUYER.
6.  Any funds remaining in this account at closing will be used as part of the
    down payment on the sale.
7.  Any funds remaining in the account if the transaction does not close will
    be returned to the BUYER.

## ARTICLE IV:  NO ASSUMED LIABILITIES

B.  BUYER has the right to request and purchase, at its own expense, Title
Insurance as normally incidental to this type of acquisition.

C.  Prior to the Closing Date, a "tail" policy of liability insurance that covers
events occurring on or prior to the Closing (the "Tail Policy") will be purchased.
BUYER will assist in obtaining this insurance to ensure the payment of as close
to Market Rate as possible for the policy.  Purchaser shall not, and shall not be
permitted to amend, repeal or modify in any manner this policy.   The intent of the

policy is to provide exculpation and indemnification to the fullest extent permitted thereunder to the SELLER and the BUYER for lawsuits and other events arising out of the sale of the company.

## ARTICLE VI:  DUE DILIGENCE BY BUYER

1. Due Diligence Deadline is July 31, 2017.

## ARTICLE VIII:  SELLER'S LIMITED WARRANTIES

6. SELLER has no obligation for commissions or finder's fees for this transaction.

## ARTICLE IX:  BUYER'S LIMITED WARRANTIES

9. BUYER represents that separate party participation in BUYER and capitalization of BUYER is required to warrant and raise the entire purchase price and complete the purchase and is conditional to the purchase agreement.
10. SELLER acknowledges that BUYER will include third party investor involvement.

## ARTICLE XI:  DEFAULT AND DEFAULT REMEDIES

D.  Default remedies will be a function as to whether the option to purchase is exercised by BUYER.

## PRELIMINARY DUE DILIGENCE ITEMS

This agreement is conditioned upon BUYER's approval of the following due diligence items (including but not limited to):

{00331715.DOCX /}

1. SELLER to provide itemized breakdown of all expenses necessary to operate parks.
2. SELLER to ensure all License, Permit, and State Requirements are properly obtained to open parks
3. SELLER to provide the following Financial Information:
   a. Balance Sheets
   b. Profit & Loss Statements
   c. Accounts Payable Aging
   d. Accounts Receivable Aging
   e. Note Payable Details
   f. List of personal property assets by location.
   g. List of Fixed Assets
   h. List of deferred maintenance items and anticipated costs associated with those items.
   i. Accrued Payroll breakdown.
   j. Any Commissions Payable breakdown.
   k. Projected budget and operating costs for one year out.
   l. Current Appraisals of Hot Springs Resort.  SELLER is not required to order, purchase or pay for any new appraisals.
   m. Current Insurance Policies.
   n. SELLER to provide BUYER all documentation regarding loan default notices and foreclosure proceedings.
4. SELLER to provide IP & IT Assets:
   a. Hardware
   b. Software – BUYER acknowledges that software licenses may not be transferable.
   c. Reservation Systems
   d. Accounting Systems
5. SELLER to maintain any know "grandfathered" benefits so they aren't lost.
6. BUYER to perform physical inspection of properties and assets
7. SELLER to disclose reason, to the extent known, why Hot Springs Resort did not close as scheduled.
8. SELLER to provide list of anticipated additional tools and equipment required for ongoing operations.
9. SELLER will arrange for BUYER to meet lenders and aid in the negotiations of debt reduction.

{00331715.DOCX /}

IN WITNESS WHEREOF, the Parties have made and executed this Addendum to the Agreement as of the date written above.

Seller:          CAMPERWORLD, INC., a Utah non-profit corporation

*Howard Smith*
HOWARD SMITH

By _____          Mark Makes
                 Signature                      Print Name(s)

Its:

*Paul Hales*
PAUL HALES

*Albert H Jeffery*
Albert H Jeffery

By _____          Ed Askew
                 Signature                      Print Name(s)

Its:

*Diane Williams*
Diane Williams
                                                 Robert Schouten
*Juanita Hales*
Juanita Hales                                    Brent Thackeray

Buyer:           SOUVALL MANAGEMENT, INC. a Utah Corporation

By _____
                 Tom Souvall

Its:

{00331715.DOCX /}

From: Diane Williams <diane@retrailia.com>
Subject: Addendum 2 - Earnest Money Deposit Date Change
Date: May 31, 2017 10:22:35 PM MDT
To: "Tom souvall (tsouvall@centurylink.net)" <tsouvall@centurylink.net>

2 Attachments, 69 KB

If you need anything else just let me know.

Sincerely,

*Diane Williams*

President



PO Box 879
West Jordan, UT 84084
www.Retrailia.com
Phone: 801-255-8166
Mobile: 801-634-7260
Fax:      801-569-3839
Diane@retrailia.com

CONFIDENTIALITY NOTICE: This e-mail message and any attachments are for the sole use of the intended recipient(s) and may contain proprietary, confidential, trade secret or privileged information. Any unauthorized review, use, disclosure or distribution is prohibited and may be a violation of law. If you are not the intended recipient or a person responsible for delivering this message to an intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

ADDENDUM NUMBER 2

This ADDENDUM NUMBER 1 to the AGREEMENT FOR SALE OF LAND AND ASSETS with contract reference date of May __23, 2017 is made and entered into as of _30_ day of May, 2017 by and between Camperworld, Inc. d/b/a Retrailia RV Resorts, successor-in-interest to Camperworld Business Trust, a Utah Business Trust, and Camperworld Utah, Inc. a Utah Corporation, as SELLER and Souvall Management, Inc, or its permitted assign(s) as BUYER. The following terms are hereby incorporated as part of the Agreement.

ARTICLE III:  EARNEST MONEY DEPOSIT; PURCHASE PRICE

A.  Change Earnest Money deposit date to be no later than May 30, 2017.

IN WITNESS WHEREOF, the Parties have made and executed this Addendum to the Agreement as of the date written above.

Seller:        CAMPERWORLD, INC., a Utah non-profit corporation

By _____        Diane Williams____
        Signature                              Print Name(s)
Its:  President/CEO

Buyer:        SOUVALL MANAGEMENT, INC, a Utah Corporation

By _____
Its:        Tom Souvall

{00393715.DOCX /}

## ADDENDUM NUMBER 3

This ADDENDUM NUMBER 1 to the AGREEMENT FOR SALE OF LAND AND ASSETS with contract reference date of May   23, 2017 is made and entered into as of  14th day of June, 2017 by and between Camperworld, Inc. d/b/a Retrailia RV Resorts, successor-in-interest to Camperworld Business Trust, a Utah Business Trust, and Camperworld Utah, Inc. a Utah Corporation, as SELLER and Souvall Management, Inc, or its permitted assign(s) as BUYER. The following terms are hereby incorporated as part of the Agreement.

## FOUNDING MEMBERS CONTRACTS

A. Remove from all contracts the section called Volunteer Time:  Founding Member agrees to volunteer for a minimum of 25 hours per year to assist in maintaining parks, improving parks, cleaning parks, etc.  In lieu of volunteer hours the Founding Member can buy their time out at a rate of $10 per hour. The hourly rate may vary from year to year, but it will not exceed $15 per hour.

IN WITNESS WHEREOF, the Parties have made and executed this Addendum to the Agreement as of the date written above.

Seller:          CAMPERWORLD, INC., a Utah non-profit corporation

By _____          Diane Williams___
          Signature                                       Print Name(s)
Its:  President/CEO

Buyer:                    SOUVALL MANAGEMENT, INC. a Utah Corporation

                          By _____
                              Tom Souvall
                          Its:

ADDENDUM NUMBER 4

This ADDENDUM NUMBER 4 to the AGREEMENT FOR SALE OF LAND AND ASSETS with contract reference date of May 23, 2017 is made and entered into as of the 27th day of July, 2017 by and between Souvall Management, Inc, or its permitted assign(s) as BUYER and Camperworld, Inc. d/b/a Retrailia RV Resorts, successor-in-interest to Camperworld Business Trust, a Utah Business Trust, and Camperworld Utah, Inc. a Utah Corporation, as SELLER. The following terms are hereby incorporated as part of the Agreement

**ARTICLE VI: DUE DILIGENCE BY BUYER**

1. Due Diligence Deadline is extended to October 1, 2017.

To the extent the terms of this ADDUNDUM modify or conflict with any provisions of the AGREEMENT FOR SALE OF LAND AND ASSETS, including all prior addenda and counteroffers, not modified by this ADDENDUM shall remain the same. BUYER shall have until 11:00 AM Mountain Time on July 31, 2017 to accept the terms of this ADDENDUM or this ADDENDUM will serve as notice of withdrawal of the AGREEMENT FOR SALE OF LAND AND ASSETS due to Due Diligence requirements.

IN WITNESS WHEREOF, the Parties have made and executed this Addendum to the Agreement as of the date written above.

Buyer:        SOUVALL MANAGEMENT, INC. a Utah Corporation

By _____

Tom Souvall

Seller:        CAMPERWORLD, INC. a Utah non-profit corporation

By _____ Signature Page Attached _____

Signature                        Print Name(s)

SIGNATURE PAGE

IN WITNESS WHEREOF, the Parties have made and executed this Agreement as of the date first above written.

SELLER:         CAMPERWORLD, INC., a Utah non-profit corporation

By _____
Mark Makin, Chairperson

By _____
Ed Askew, Vice-Chair

By _____
Robert Schouten, Treasurer

By _____
Juanita Hales, Secretary

By _____
Paul Hales, Board Member

By _____
Albert Jeffery, Board Member

By _____
Howard Smith, Board Member

By _____
Brent Thackeray, Board Member

By _____
Diane Williams, President/CEO

SIGNATURE PAGE

IN WITNESS WHEREOF, the Parties have made and executed this Agreement as of the date first above written.

SELLER:                    CAMPERWORLD, INC., a Utah non-profit
                           corporation

                           By_____
                              Mark Makin, Chairperson

                           By_____
                              Ed Askew, Vice-Chair

                           By_____
                              Robert Schouten, Treasurer

                           By    _Juanita Hales_____
                              Juanita Hales, Secretary

                           By_____
                              Paul Hales, Board Member

                           By_____
                              Albert Jeffery, Board Member

                           By_____
                              Howard Smith, Board Member

                           By_____
                              Brent Thackeray, Board Member

                           By_____
                              Diane Williams, President/CEO

IN WITNESS WHEREOF, the Parties have made and executed this Agreement as of the date first above written.

SELLER:

**CAMPERWORLD, INC.,** a Utah non-profit corporation

By_____
   Mark Makin, Chairperson

By_____
   Ed Askew, Vice-Chair

By_____
   Robert Schouten, Treasurer

By_____
   Juanita Hales, Secretary

By_____
   Paul Hales, Board Member

By_____
   Albert Jeffery, Board Member

By_____
   Howard Smith, Board Member

By_____
   Brent Thackeray, Board Member

By_____
   Diane Williams, President/CEO

SIGNATURE PAGE

IN WITNESS WHEREOF, the Parties have made and executed this Agreement as of the date first above written.

SELLER:                                 **CAMPERWORLD, INC.**, a Utah non-profit corporation

By _____
Mark Makin, Chairperson

By _____
Ed Askew, Vice-Chair

By _____
Robert Schouten, Treasurer

By _____
Juanita Hales, Secretary

By _____
Paul Hales, Board Member

By _____
Albert Jeffery, Board Member

By Howard Smith
Howard Smith, Board Member

By _____
Brent Thackeray, Board Member

By _____
Diane Williams, President/CEO

## SIGNATURE PAGE

IN WITNESS WHEREOF, the Parties have made and executed this Agreement as of the date first above written.

SELLER:

**CAMPERWORLD, INC.**, a Utah non-profit corporation

By_____
Mark Makin, Chairperson

By_____
Ed Askew, Vice-Chair

By_____
Robert Schouten, Treasurer

By_____
Juanita Hales, Secretary

By_____
Paul Hales, Board Member

By_____
Albert Jeffery, Board Member

By_____
Howard Smith, Board Member

By___ *(signature)* ___ 7-28-17
Brent Thackeray, Board Member

By_____
Diane Williams, President/CEO

ADDENDUM NUMBER 5

This ADDENDUM NUMBER 5 to the AGREEMENT FOR SALE OF LAND AND ASSETS with contract
reference date of May 23, 2017 is made and entered into as of the 27th day of July, 2017 by and
between Souvall Management, Inc, or its permitted assign(s) as BUYER and Camperworld, Inc. d/b/a
Retrailia RV Resorts, successor-in-interest to Camperworld Business Trust, a Utah Business Trust, and
Camperworld Utah, Inc. a Utah Corporation, as SELLER. The following terms are hereby incorporated as
part of the Agreement.

**ARTICLE XII: Purchase Terms**

1. Buyer and Seller agree to allocate the total purchase price as follows:

   - Echo Island:  $3,000,000
   - Knotty Pine:  $2,000,000
   - Pleasant Creek: $1,000,000
   - Lakeside: Accounts payable (estimated to be approx. $800,000). Title will
     be assumed and income generated will be allocated to pay any accounts
     payable over time as per the Chapter 11 bankruptcy plan.
   - Zions Gate and Hot Springs: Buyer agrees to honor founding member
     contracts being converted to a right to use of RV sites.

2. Buyer and Seller agree that once the total purchase price has been paid any excess
   funds are to be held in escrow for the use of deferred maintenance and or utilities.

3. Buyer and Seller agree that once the total purchase price has been paid that Camper
   World Inc. members will transfer any and all ownership per ARTICLE X to Souvall
   Management Inc, and/or assigns.

To the extent the terms of this ADDUNDUM modify or conflict with any provisions of the AGREEMENT
FOR SALE OF LAND AND ASSETS, including all prior addenda and counteroffers, not modified by this
ADDENDUM shall remain the same. BUYER shall have until 5:00 PM Mountain Time on August 16, 2017
to accept the terms of this ADDENDUM.

IN WITNESS WHEREOF, the Parties have made and executed this Addendum to the Agreement as of the
date written above.

Buyer:          SOUVALL MANAGEMENT, INC. a Utah Corporation

                By _____

                Tom Souvall

SELLER:

**CAMPERWORLD, INC.**, a Utah non-profit corporation

By _____
Mark Makin, Chairperson

By _____
Ed Askew, Vice-Chair

By _____
Robert Schouten, Treasurer

By _____
Juanita Hales, Secretary

By _____
Paul Hales, Board Member

By _____
Albert Jeffery, Board Member

By _____
Howard Smith, Board Member

By _____
Brent Thackeray, Board Member

By _____
Diane Williams, President/CEO

## ADDENDUM NUMBER 6

This ADDENDUM NUMBER 6 to the AGREEMENT FOR SALE OF LAND AND ASSETS with contract reference date of May 23, 2017 is made and entered into as of the 29th day of September, 2017 by and between Souvall Management, Inc, or its permitted assign(s) as BUYER and Camperworld, Inc. d/b/a Retrailia RV Resorts, successor-in-interest to Camperworld Business Trust, a Utah Business Trust, and Camperworld Utah, Inc. a Utah Corporation, as SELLER. The following terms are hereby incorporated as part of the Agreement.

### ARTICLE VI: DUE DILIGENCE AND CLOSING BY BUYER

1. Seller has declared bankruptcy in the United States District Court for the District of Utah, case number 17-27764. The sale is now subject to bankruptcy court approval, and will not be binding upon Seller until entry of a final order by the bankruptcy court approving such sale.
2. The settlement deadline is extended through and including November 29, 2017. The sale is subject to Buyer's contingency of receiving its loan and acceptable title commitments due to recent bankruptcy of Seller. Other items are complete and acceptable to continue with the purchase.
3. Additional details regarding the sale and payment of claims in the bankruptcy case will be addressed by Buyer and Seller in a subsequent addendum.

To the extent the terms of this ADDUNDUM modify or conflict with any provisions of the AGREEMENT FOR SALE OF LAND AND ASSETS, including all prior addenda and counteroffers, not modified by this ADDENDUM shall remain the same.

IN WITNESS WHEREOF, the Parties have made and executed this Addendum to the Agreement as of the date written above.

Buyer:     SOUVALL MANAGEMENT, INC. a Utah Corporation

By _____

Tom Souvall, President

Seller:     CAMPERWORLD, INC. a Utah non-profit corporation

By _Diane Williams_____

Diane Williams, President

## ADDENDUM NUMBER 7

This ADDENDUM NUMBER 7 to the AGREEMENT FOR SALE OF LAND AND ASSETS with contract reference date of May 23, 2017 is made and entered into as of the 12th day of October, 2017 by and between Souvall Management, Inc, or its permitted assign(s) as BUYER and Camperworld, Inc. d/b/a Retrailia RV Resorts, successor-in-interest to Camperworld Business Trust, a Utah Business Trust, and Camperworld Utah, Inc. a Utah Corporation, as SELLER. The following terms are hereby incorporated as part of the Agreement.

1. The Buyer is hereby identified as Osiris, LLC, a Utah limited liability company.  Souvall Management, Inc. hereby assigns all rights under the Agreement for Sale of Land and Assets to Osiris, LLC, and Seller hereby consents to such assignment.

2. Buyer represents and warrants that none of the owners of Osiris, LLC are members, officers, or directors of Seller.  To the extent of any deviation from the above, Buyer shall disclose such relationships on or before October 18, 2017.

3. Buyer acknowledges that a portion of Seller's debts and obligations stem from that certain Joint Plan of Reorganization of the Debtor and Committee dated August 4, 2015 (the "Plan"), which was confirmed by the United States Bankruptcy Court for the District of Utah, in that certain bankruptcy case styled In Re: *Camperworld Business Trust*, case number 15-20383. Said Court confirmed the Plan by Order entered on September 2, 2015, at docket number 270 of such bankruptcy case.

4. Structure of Sale.  Buyer's consideration for this sale is comprised of funds at Closing, and assumption of all of Seller's debts and obligations which are not paid in full at Closing, including all debts and obligations treated in the Plan. At the Closing, Buyer shall pay sufficient funds to clear all liens and secured claims against title to the Purchased Assets, all taxes (including property taxes, sales taxes, transient taxes, and all other taxes due by Seller), all utilities and other fees related thereto, all water rights assessments or other fees, all HOA fees and similar obligations, professional fees incurred by Seller since September 6, 2017, regardless of whether or when such professional fees have been allowed by the bankruptcy court, including by Buyer placing an estimated amount of what such professionals believe will be owed to complete the Seller's bankruptcy case on retainer with such professionals, any and all other debts incurred by Seller which are not treated in the Plan. For all debts and obligations of Seller treated in the Plan, and unless otherwise agreed upon by the creditor, Buyer shall attempt to pay all such debts and obligations which are administrative claims under the Plan in full at Closing.  For any amount of such administrative claims which are not paid in full at Closing, Buyer shall cause a lien to be recorded against the 17 Zions Gate lots purchased in this sale, securing Buyer's obligation to pay such administrative claims.  All such administrative claims shall be paid in full on or before the date that is six (6) months after the Closing, or such claim holders shall be entitled to exercise their rights to foreclose such lien.  All other debts and obligations which are treated in the Plan shall be paid by Buyer according to the amounts and schedules set forth in the Plan.

5. As part of this sale, Buyer desires for Seller to reject all executory contracts, including all existing member contracts, except as set forth below.  As set forth elsewhere in the Agreement for Sale of Land and Assets, Buyer will offer new memberships to all of Seller's

{01238088-3 }

existing members.  The executory contracts Buyer desires for Seller to assume and assign, and for which Buyer shall pay any and all cure damages at the Closing, are as follows (amounts stated below are the Seller's estimated amounts due, but are not binding and Buyer shall pay whatever the actual amount due is):

    a. Contract with Bear River Canal regarding Hot Springs Water Shares, with an estimated balance due at Closing of $1,765.01.

    b. Contract with West Hoytsville Irrigation regarding 5 Acre Fee, Ditch Access, with an estimated balance due at Closing of $375.00.

    c. Contract with Weber Basin Water regarding Replacement Water Contract – KP, with a name of Resort Campers, Ltd.

    d. Contract with Central Utah Water regarding Lakeside Park irrigation water usage, with an estimated balance due at Closing of $1,321.75.

    e. Contract with Central Utah Water regarding Knotty Pine irrigation water usage.

To the extent the terms of this ADDUNDUM modify or conflict with any provisions of the AGREEMENT FOR SALE OF LAND AND ASSETS, including all prior addenda and counteroffers, not modified by this ADDENDUM shall remain the same.


IN WITNESS WHEREOF, the Parties have made and executed this Addendum to the Agreement as of the date written above.


Buyer:        OSIRIS, LLC, a Utah limited liability company


By _____

Print Name: _Alexander Souvall_____, Manager


Former Buyer:    SOUVALL MANAGEMENT, INC., a Utah corporation


By _____

Tom Souvall, President


Seller:        CAMPERWORLD, INC. a Utah non-profit corporation


By _____

Diane Williams, Officer


{01238088-3 }